[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 300 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 301 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 302 
It will be convenient to consider, first, that part of the will which relates to the establishment of a dispensary for indigent sick and lame persons. By that provision the testator declared that he "would wish a public dispensary, as in New York, on a similar plan, for indigent persons, both sick and lame, to be attended, by a physician elected to the establishment, at their own houses, and also daily *Page 303 
at the establishment. My executors to consult judicious men in Albany respecting the same, and funds enough to carry on the building and yearly expenses." According to one construction of this clause — a construction certainly plausible — a discretion was reposed in the executors to determine the location of the proposed establishment, its extent and particular characteristics, and the amount of funds to be devoted to the object. The actual exercise of that discretion by those in whom it was confided might, by rendering uncertainty certain, relieve the bequest from the objections arising out of its vague and indefinite character. The will of a testator may be ascertained by the acts of those to whom he has entrusted discretion and power. Such acts may be justly regarded as the definite expression of his own purpose.
But, in this view of the present question, the objections encountered are, that the discretion was personal to the individuals appointed to be executors, and that they renounced the trust. That the discretion was personal, and not official, it hardly needs argument to prove. The duties to be performed were of a responsible and delicate character; and they were certainly distinct from those which are usually devolved on the office of executor. For the performance of these duties, the testator selected the persons in whose integrity and fitness he was willing to confide; and he made no provision for a devolution of the trust upon any one else in any event whatever. The plaintiff is the administrator with the will annexed: but he cannot, in that character, execute powers and trusts which were personal to the executors who have renounced. The statute, it is true, provides that, "in all cases where letters of administration with the will annexed shall be granted, the will of the deceased shall be observed and performed; and the administrators with such wills shall have the same rights and powers, and be subject to the same duties, as if they had been named executors in such will." (2 R.S., p. 72, § 22.) This statute has not been understood as introducing any new principle of law. (Dimmick v. Michaell, 4 Sandf. S.C., 409, 410; Edgerton's Adm'rs v. Conklin, 25 Wend., 233.) Its terms, broad *Page 304 
as they are, do not embrace a case like the present. "The will of the deceased shall be observed," c. But the precise difficulty here is, that the will of the testator, in the respect under consideration, has not been declared. His intentions, as we are now assuming, were indefinite and unexpressed, and were to take a determinate form and expression only in the discretionary acts of the persons named as executors. Trusts and powers, perfectly defined, relating to the personal estate of a testator, without doubt devolve on the administrator cum testamento annexo. But he does not, in virtue of his office, succeed to a power which is personal in its very nature, and which is intended by its author to be executed only by the individuals to whom he has intrusted it.
The written renunciation of the executors, filed in the office of the Surrogate, was, in terms, of their office as such. That renunciation has been followed by twenty years of non-interference with the estate of the decedent, in any character whatsoever. They have never taken any step in the direction of giving effect to the charities confided to their judgment and discretion. In behalf of these charities it has been argued that, although the assets of the deceased passed into the hands of the administrator, yet the personal trust reposed in the executors still lives, and is capable of execution. But their renunciation of the executorial office, followed by this long period of inactivity, can mean no less than an absolute and final abdication of the trusts contained in the will. They had a right to take that course. Conceding that they might, if they had chosen so to do, devise a plan for a dispensary, appoint the place of its location, and designate the necessary amount of funds, so that a court of equity might compel the administrator to appropriate the sum required, yet they were under no legal obligation to perform these acts. Having refused to qualify as executors, they never became accountable for any portion of the estate to be applied in charity or otherwise. Rejecting, then, the estate and the executorial duties which the testator wished to cast upon them, they certainly were not bound to accept any peculiar and still more confidential relations *Page 305 
which the will proposed. A testamentary direction, requiring some portion of an estate to be applied by the executor to a charitable object — the plan of the charity and the sum necessary for its execution to be designated by some person not the executor — might perhaps be enforced, if the person named elected to accept the personal trust and make the designation or appointment. But it is extremely plain that such acceptance must be voluntary. The right of renouncing a trust which has no necessary connection with the office of executor is no less clear than the right of renouncing the office itself; and, in either instance, the right rests upon the very simple and elementary proposition that no man can be compelled, against his own will, to execute the testamentary wishes of another. (Burritt v.Silliman, 3 Kern., 93.)
The argument, therefore, for sustaining this provision of the will, founded on a supposed discretion in the executors, the exercise of which might render the testator's wishes definite and certain, must fall to the ground. Upon all the facts before us, their renunciation of all right or intention to act must be deemed final and the discretion extinct and gone. Intestacy as to any portion of the estate designed for the dispensary is the necessary result; because, in this view of the subject, the testator has failed to speak. (Fontain v. Ravenel, 17 How. U.S., 369.) I am speaking here of intestacy according to legal rules. The cy pres power of courts of equity, where charity is the purpose or object of a bequest which is void or inoperative at law, will be hereafter considered.
If, taking another view of the provision in question, we say that the executors were not appointed to be the authors of a scheme for the proposed dispensary, with discretionary powers as to the amount of endowment and other circumstances, we shall find the difficulties still more obvious. All that we can ascertain from the language of the testator is, that he had in his mind a vague and shadowy conception of a dispensary, similar to those in the city of New York, without any determinate views as to the place of its foundation, the mode of perpetuating and governing it, or the amount of expenditure *Page 306 
and investment necessary to establish and maintain it. Putting aside, as we now do, the idea of a delegated discretion which might cure these defects, there are wanting all the elements of certainty which are necessary to impart validity to this bequest. The testator, in effect, declared that he devoted a blank sum of money to found and perpetuate an institution of charity, which, in his mind, was also a blank as to every thing except the general purpose which he designed to promote. Here is a fatal uncertainty, both as to the subject and the object of the bequest. It needs no authority to prove that such a provision is void, when tested by the rules of law. If the testator neither specified how much of his estate he desired to give to this charity, nor furnished the means of ascertaining the sum through a delegated discretion or otherwise, the legal result plainly is that he gave nothing at all, and his next of kin are entitled to take the fund. The same conclusion may be derived from the consideration that there is no donee of the gift; by which is meant a donee to take the legal interest in the fund, and apply and dispense it in furtherance of the testator's charitable intent. Of course, the executors, if they had qualified, would have taken the legal interest in all the testator's personal estate in virtue of their office. But they were not appointed the trustees of this charity, nor was the fund specially bequeathed to them in that character. They might consult with judicious men, and perhaps determine, in their discretion, upon some plan of the charity, and upon the sum of money required to effectuate it. But there, their duties and powers would end, because they are not appointed to take the title of the proposed establishment, or to retain and invest the capital sum necessary to support it. In this respect, the will is a blank. As there is no person or corporate body appointed to take the bequest, the necessary legal consequence is that it fails altogether.
There is, then, no principle of law or rule of equity regulating trusts, other than charitable, which will support this bequest. The inquiry, therefore, now is, whether there is anything in the law of charitable uses, as a peculiar system, by *Page 307 
which it can be sustained. The English law on this subject is derived from the jurisdiction of the Court of Chancery over trusts; from the prerogative of the Crown, and from the statute of 43 Elizabeth, chapter 4. (Owens v. The Missionary Society,14 N.Y., 387.) In this State we have no royal prerogative, and the statute of Elizabeth was repealed by the legislature in 1788. Our system of charity law, therefore, derives nothing from either of these two sources; and its origin must, consequently, be referred to the jurisdiction which the English Court of Chancery exercised, independently of prerogative and of the statute of Elizabeth. What was the extent of that jurisdiction over charitable trusts? Was it restricted precisely by the rules which regulate other trusts? Did it transcend those rules? and, if so, to what extent and in what cases? These are inquiries which have occupied the ablest judicial minds in this country, and great diversity of opinion has been the result. This diversity, perhaps, sufficiently proves that the inquiries are incapable of a perfectly exact solution. Nor is such a solution of fundamental importance. The courts of this State will confine themselves to powers which are strictly judicial; and, under that limitation, they may be deemed competent to determine what is and what is not a valid and effectual charitable donation. The English system of law on this subject, derived from the three sources mentioned, is confessedly much more comprehensive than ours. If we are unable to ascertain with entire accuracy how much of that system is derived from any one of these sources in exclusion of the others, we may, at least, determine how much of the blended mass is adapted to our own situation and wants, being careful, however, not to transcend the limits of judicial authority.
There are two cases, recently decided in this court, which deserve a particular attention, because the principles expressly asserted in the one, and conceded, if not affirmed, in the other, are decisive of the present question. In Williams v. Williams
(4 Seld., 527), a testator bequeathed the sum of $6,000 to three trustees as a fund for the education of poor children at the *Page 308 
academy in the village of Huntington, to be taken from those whose parents' names were not in the tax-list. The trustees, to whom the legacy was given, were constituted a board for the management of the fund; and, as vacancies might occur, the mode of supplying them in perpetuity was pointed out. Particular directions were given for the investment of the sum, and the accumulation and appropriation of the interest In the opinion of the court, delivered by Judge DENIO, it was assumed that the bequest, according to the general rules of law, would be void for want of an ascertained ceslui que trust, in whom the equitable title would vest (p. 540); it being justly considered that the "children of the poor" were quite too indefinite a class to be entitled in law to take as beneficiaries. Notwithstanding this assumption, the bequest was sustained. The learned judge examined at some length the English doctrine of charitable uses, and he stated his conclusion to be, that the law of charities was, at an indefinite but early period, ingrafted upon the common law, and that the statute of Elizabeth was not introductory of any new principles, but was only a new and less dilatory and expensive method of establishing charitable donations understood to be valid by the laws antecedently in force (p. 542). The opinion, however, not merely conceded, but maintained, that, under our political system, with its precise distribution of the powers of government, the English law on this subject is in force here only so far as it is capable of administration in the exercise of strictly judicial power. "We have no magistrate," it was observed, "clothed with the prerogatives of the Crown, and our courts of justice are entrusted only with judicial authority." The cy pres doctrine of the English Chancery, in other words the right of making an approximate or discretionary will for a testator, where he has only declared some indefinite, illegal, or ineffectual charitable purpose, was distinctly disavowed. The case itself must be viewed as a well-considered authority for the proposition that a charitable gift, definite both in its subject and purpose, and made to a definite trustee, who is to receive the fund and apply it in the manner specified, is to be maintained, although *Page 309 
it would be void by the general rules of law, because the particular objects of the gift, or persons to be benefited by it, are unascertained. Such a gift is capable of being enforced by a judicial sentence; and it affords neither room nor justification for an exercise of the cy pres power. So much, then, of that which is peculiar in the English system of charitable trusts ought to be considered as settled in the jurisprudence of this State. But beyond this we cannot go, without exercising functions which are not judicial; which, in England, rest on prerogative, and are there exercised by the sign-manual of the Sovereign, or by the Court of Chancery, as the keeper of his conscience.
The other case to be particularly noticed is Owens v. TheMissionary Society of The Methodist Episcopal Church, determined three years later (14 N.Y., 380). In that case the bequest was of the residue of the testator's estate to "The Methodist General American Missionary Society appointed to preach the gospel to the poor, L.C." That society was unincorporated at the time of the testator's decease, and the gift was directly to it, without the intervention of any trustee to take and administer the fund and maintain the charity. An opinion, concurred in by a majority of this court, was delivered by Judge SELDEN, in which, with great learning and research, he traced the jurisdiction of the English Chancery over charitable uses to its respective sources; and he came to the conclusion that the peculiar features of that system of law were derived from the statute of 43 Elizabeth, and, consequently, that those peculiarities are no part of the law of this State. The bequest was adjudged to be void; a majority of the judges assenting to that conclusion, not only upon the basis laid down in that opinion, but also on the ground that the indefiniteness of the charitable purpose indicated by the testator would vitiate the gift, even according to the English law. There is certainly a want of coincidence between the opinion of Judge SELDEN and that of Judge DENIO, in the previous case, upon a question of juridical history, which I am inclined to think is not one of fundamental importance. We are justified in so thinking, *Page 310 
because the diversity of views on that question led to no practical difference in conclusion or result. The authority ofWilliams v. Williams was conceded in the later case, the distinction taken being, that, in the one case, there was a competent trustee of the fund, while, in the other, there was not. And, to avoid all misapprehension, Judge SELDEN qualified the result of his opinion by conceding that "courts of equity in this State have power to enforce the execution of trusts created for public and charitable purposes in cases where the fund is given to a trustee competent to take, and where the charitable use is so far defined as to be capable of being specifically executed by the authority of the court, even although no certain beneficiary, other than the public at large, may be designated." Now, this concession yields all that was claimed or determined in the previous case, while the concession in that case yields all that was determined in this. The joint authority of both decisions establishes these propositions: 1. That a gift to charity is maintainable in this State if made to a competent trustee, and if so defined that it can be executed as made by the donor by a judicial decree, although it may be void according to general rules of law for want of an ascertained beneficiary; 2. In other respects, the rules of law applicable to charitable uses are within those which appertain to trusts in general; 3. The cypres power, which constitutes the peculiar feature of the English system, and is exerted in determining gifts to charity where the donor has failed to define them, and in framing schemes of approximation near to or remote from the donor's true design, is unsuited to our institutions, and has no existence in the jurisprudence of this State on this subject. We ought to accept these rules as the law of this State, because they are the necessary result of the carefully considered decisions of this court which have been mentioned; and we think that a reëxamination of the principles and authorities on which those decisions were based, would now be inappropriate.
It is an obvious conclusion from these premises, that the law of charities cannot be invoked in aid of the bequest now under consideration. It has been shown that, in one view of the *Page 311 
will, the consummation of the testator's charitable purpose was referred to the judgment and discretion of the executors, and that the purpose has failed by their renunciation. As judicial power is exercised in the interpretation of wills, and in establishing them as made by testators, and not in framing them, this difficulty is incurable. In England the cy pres power would be exerted in such a case; and a scheme would be devised by a master of the Court of Chancery, or the Crown would appoint the charity under the sign-manual. In either mode of exercising that power, it rests upon prerogative, and is a creative energy, which, as we have seen, does not belong to our judicial system. In Fontain v. Ravenel (supra), the testator gave the residue of his estate to his executors to be disposed of for the use of such charitable institutions in Pennsylvania and South Carolina as they should deem most beneficial to mankind. Here was a power of selection to be exercised in the discretion of the executors. But they died before the period arrived when the selection could be made. The gift, therefore, could not be executed as the testator made it, and it was held that his heirs, or next of kin, were entitled to the fund. So, in this case, the executors having renounced, the discretion in which the testator confided is dead, and there is no power in us to reconstruct the gift which has failed as he intended to make it. And if we lay out of view the element of discretion, either as not conferred by the will or as extinct by renunciation, we encounter a defect which would not be remediable even according to the cy pres
doctrine. The subject of the bequest, or thing intended to be given, is undefined. Of course, it was money, to be expended in founding and maintaining a dispensary; but there are no means of ascertaining the sum which the testator intended to give. In such a case, even prerogative would hesitate to declare how much of the estate should be taken from those who are by law entitled to all that is not effectually disposed of by the testator himself; and I think that, among all the extreme cases determined by the English courts in favor of charities, none can be found giving effect to a gift which is void in law for the reason *Page 312 
here suggested. It is the indefiniteness of the object and purpose of a charitable donation, and the impossibility of effectuating it as the donor intended, which have furnished occasion in so many cases for the exercise of the cy pres
power. But, in all the cases, I think it will be found that the donor did not leave in hopeless uncertainty the gift itself.
The sum intended for the dispensary was to be taken from the residuum of the testator's estate, after satisfying certain enumerated legacies. That object being provided for, the testator then bequeathed his remaining estate to his executors in trust, to apply the same, in their discretion, as "they should think fit and proper," to the treasurer or other officer having the pecuniary management of any one or more societies for the support of indigent and respectable persons, especially females and orphans, and for the use of said societies; and he declared it to be his intention to give to his executors discretionary power as to the disposition of the fund, so that it be applied to objects of charity. This provision will require but a brief consideration. The first inquiry is, whether the sum designed for a dispensary, in consequence of the failure of that purpose, goes to the next of kin as undisposed of, or falls into the ultimate remainder under this clause. If the latter, then the whole residue of the estate, after satisfying the specific bequests, is given to the executors for the charitable purposes mentioned in the final clause. But such is not the construction or effect of this provision. The general rule undoubtedly is, that, in a will of personal estate, a general residuary clause carries to the residuary legatees whatever is not otherwise legally and effectually disposed of. Such is the presumed intention of the testator in most cases. But the authorities do not apply this doctrine where the bequest is of the residue of a residue and the first disposition fails. The opposite rule, I think, universally prevails in such cases. In the case of Skrymsher v. Northcote
(1 Swanst., 570), the Master of the Rolls said: "It seems clear on the authorities that a part of the residue of which the disposition fails will not accrue in augmentation of the remaining parts as a residue of a residue; but, instead of resuming the *Page 313 
nature of residue, devolves as undisposed of." (Ward on Legacies, 32, and cases cited, 18 Law Lib.; Floyd v. Barker, 1 Paige, 480; Attorney-General v. Davies, 9 Ves., 535.)
Now, we have seen that the sum which the testator intended to give for a dispensary was wholly uncertain in amount, and that the bequest was void on that and other grounds. As that portion of the residuum must go to the next of kin as undisposed of the final gift of the remainder involves precisely the same uncertainty, and is void for the same reason. In order to ascertain the amount of this gift, the sum intended to be previously appropriated out of the whole residue must first be known. But, as that cannot be known, the ultimate bequest falls to the ground also. This is clear in reason and logic, and it is well settled by authority. In Chapman v. Brown (6 Ves., 404), a testatrix gave a residue of her estate to her executors in trust, 1st, to build a chapel, but devoting no particular sum to that object; 2d, if there should be any overplus, for the support of a preacher, not exceeding £ 20 a year; and, 3d, if any further overplus, the sum was to be expended in such charities as the executors should think proper. Here was a residuum divided into three parts. The first gift was adjudged void, as against the laws of mortmain. The second, being dependent upon the first, failed also. As the chapel could not be built, no preacher was wanted. The third and last, standing by itself, was conceded to be good, according to the law of charitable uses in England. But the objection to it was, that the amount of that bequest could not be ascertained without first determining what sum would have been required to build the chapel, which, together with the £ 20 per annum for the preacher, did not fall into the ultimate residuum, but went to the heirs and next of kin. But that sum was held to be incapable of ascertainment, because the chapel was not to be built, and the final remainder to general charity was therefore equally uncertain. That bequest was also adjudged to be void on this ground alone, and the whole residuary estate was consequently declared to be undisposed of by the will. This decision, which has always been recognized as a sound one, not only establishes *Page 314 
the point to which it is here cited, but it verifies also the observation before made, that a legal uncertainty in the subject of a gift is incurable, even by the law of charities in England. A similar decision was made in the case of The Attorney-General
v. Hinxman (2 Jac. Walk., 270). Again, it was held, inLimbrey v. Gurr (6 Madd., 151), that, where a residue is given to a valid purpose, it fails with a prior void purpose, if not capable of being ascertained except by the actual execution of that purpose. The valid purpose in that case was also a charity.
The final bequest, therefore, in the case now before us, was void for the reason that the remainder of the residuary estate intended to pass to the executors under that bequest, is incapable of being ascertained. It is also void by reason of the indefiniteness of the object of the gift. If this defect could be aided by an exercise of the unlimited discretion reposed in the executors, to whom the fund was given in trust, they have renounced, not only as executors but as residuary legatees in trust also. On this branch of the question, enough has been said in examining the provision in regard to the dispensary.
The remaining question arises upon the provision which directed the executors to purchase a farm in trust for the benefit of the testator's nephews and nieces. I am of opinion that this clause was intended to create an express trust to receive the rents and profits of land, and apply them to the use of the beneficiaries designated; and, consequently, that the trust, in its nature and kind, is permitted by our statute of uses and trusts. (1 R.S., 728, § 55.) No technical or precise words are necessary in order to constitute such a trust. If the direction is such as to vest the title in the trustee; if his duties are active instead of passive; and if the possession is subjected to his control, so that he may, in his pleasure or discretion, exclude the beneficiary therefrom; and if, with these directions, there is no other declared purpose of the testator, a trust to receive the rents and profits is the necessary result of the arrangement. Rents and profits are the incidents of the possessory right; and, certainly, it is the duty of the trustee to pay them over, *Page 315 
or apply them to the use of the person for whose benefit the grant or devise is made.
In this case, the direction of the testator to the executors was to invest $6,000 in the purchase of a farm in trust, c. The meaning of this plainly is, that they were to take the legal title to themselves as trustees. The beneficiaries of this trust were the nephews and nieces of the testator, and a "wish" is expressed that they should "come and occupy" the farm; but this wish is qualified by an explicit declaration that such occupancy shall be subject to the absolute control of the executors, whose directions are to be followed without "cavil or dispute." They were to be, therefore, not merely passive trustees. Their duties were active, and they consisted in controlling the possession at their discretion for the benefit of the cestuis que trust. The latter were entitled only to the results, in other words to the rents and profits. These they might receive directly as occupants, if the trustees permitted, or they might take them from the hands of the trustees themselves. Undoubtedly, a trust to receive and apply the rents and profits of land may be executed in either of these modes; and the expression of a wish by a testator in favor of one mode rather than the other does not deprive the trust of its real character, so long as the wish is so qualified as not to interfere with the discretion and power of the trustee.
But this trust, although, as to its nature and kind, falling within the permitted class, is invalid, because it proposed an illegal suspension of the power of alienation. If the farm had been purchased according to the direction, both the legal estate of the trustees and the beneficial interest of the cestuis quetrust would have been inalienable for a term of fifteen years. The beneficial interest in a trust to receive rents and profits is unassignable; and, inasmuch as the trust declared by the testator in this case ought to appear on the face of the conveyance to the executors, any sale of the legal estate by them within the fifteen years would be in contravention of such trust, and would be void. (1 R.S., 730, §§ 63, 64, 65; Hawley v.James, 16 Wend., 61.) But, with one exception, *Page 316 
not now material, the absolute power of alienation cannot be suspended for a longer period than during the continuance of not more than two lives in being at the creation of the estate. (1 R.S., 723, § 15.) It has been repeatedly adjudged that any attempted suspension of this power, not dependent on lives, but for an absolute term of time, whether long or short, is a violation of the letter and policy of this provision of law. (Hawley v. James, supra; Boynton v. Hoyt, 1 Denio, 53.) It seems to result, necessarily, that the direction in this will to invest the $6,000 in a farm upon the trusts mentioned was contrary to the statute and void. This conclusion being clear, if I am right as to the trust and its character, it becomes unnecessary to inquire whether a trust to receive the rents and profits of land and apply them to the use of an alien beneficiary would be valid, if the trust were so constituted as to be free from any other objections.
If I am mistaken in supposing that the trust in question is of the character mentioned, and void as an attempt to suspend the power of alienation, the only alternative construction is, that the nephews and nieces of the testator (but for the difficulty arising from their alienage) would have been entitled, if the farm had been purchased, to the possession and to the rents and profits in exclusion of the executors. In that view, the trust attempted to be created would have been passive, and the nephews and nieces would take the legal estate. In this aspect the trust would not be illegal or void, but the use would be executed by the statute of uses and trusts, and the legal title would vest in the beneficiaries. (1 R.S., 727, §§ 47, 49.) The objection that they were aliens, however, stands in the way, not of this construction, but of the consequences which flow from it, because the statute of wills declares that a devise to an alien of any interest in land shall be void. (2 R.S., 57, § 4.) A direction in a will that money be laid out in land to be conveyed to or for the benefit of an alien, so as to invest him with the possession and the rents and profits, would undoubtedly fall within that provision. It is impossible, therefore, in any view, to uphold this direction of the will. *Page 317 
At the end of the fifteen years, the executors were authorized to sell the land and distribute the proceeds among the nephews and nieces. This would have been a lawful trust, or power in trust, if the postponement of its execution for an absolute period of time did not suspend the power of alienation in a manner which the statute does not permit. That suspension is fatal to this trust also. It is to be observed, moreover, that, inasmuch as the direction to purchase the land cannot be executed, for the reasons which have been given, so the authority to sell it and divide the proceeds necessarily falls to the ground with that direction.
The intention of the testator was, that a sum of money should be laid out in land, and the rents and profits enjoyed by his nephews and nieces for fifteen years; that the land should then be reconverted, and the money divided among them. The design to give the money to them was strictly lawful; and my first impression was, that the final bequest might take effect in their favor as a vested legacy, payable at the end of fifteen years from the testator's decease. To reach such a result, it is not required to execute the unlawful direction to purchase and hold the land and then to sell and reconvert it. No conversion being in judgment of law possible, no reconversion is either necessary or possible. Disregarding those directions, the original gift was of money, and it was to be finally paid over in money at a certain future period. So much of the testator's intention might, therefore, be effectuated consistently with the rules of law, and without disturbing any other portion of his will. In this view of the subject, I think the legacy was vested in the beneficiaries in equal shares, subject to be divested as to the equality of division by an exercise of the discretionary power of apportionment given to the trustees. (1 Roper on Legacies, 400, 402, 1st Am. ed.; Hill on Trustees, 79, and cases cited;Dominick v. Sayre, 3 Sandf. S.C., 555.) I had proposed, therefore, to give effect, in the manner here suggested, to the testator's undoubted intention that his nephews and nieces should have the principal sum bequeathed, at the end of fifteen years. But my brethren find *Page 318 
a difficulty which they think cannot be overcome. The direction is to invest a sum not exceeding $6,000 in a farm, c. The maximum limit is fixed; but below that, the amount to be thus invested was left wholly in the discretion of the executors. They might purchase a farm of any value below $6,000. This discretion cannot now be exercised, because the executors have renounced. It was never capable of being exercised, because, as we have seen, the direction itself was unlawful and void. Viewing the bequest, therefore, as a vested pecuniary legacy, the sum given appears to be wholly undefined, and I acquiesce in the suggestion that this is fatal to the gift. The judgment of the Supreme Court must be affirmed.
All the judges agreed that the trust for the benefit of the nephews and nieces was void for the reason last assigned; all except DENIO and MASON, Js., who adhered to the views expressed by the former in Williams v. Williams (4 Seld., 527), concurred in the opinion of COMSTOCK, Ch. J.; SELDEN, J., however, took exception to some of its language in respect to thecy pres doctrine, holding that the Court of Chancery, in supplying defects of detail in the directions for the execution of the trust by means of a scheme, exercised a power which was purely judicial, and to which our courts have succeeded.
Judgment affirmed.