In the Matter of the Judicial Settlement of the Account of Proceedings of JOHN A. STEWART and Others, as Trustees under the Last Will and Testament of JOHN B. TREVOR, Deceased, Appellants, Respondents (Glenview Maintenance Fund).

EMILY N. TREVOR and Others, Appellants, Respondents; GEORGE S. TREVOR and Others, by ERNEST A. BIGELOW, their Special Guardian, and Others, Respondents, Appellants.

*Will — construction of a clause directing executors to maintain a family residence — when it is an active trust — manner of maintenance — authority to set aside a fund therefor — a portion of the principal thereof improperly used supplied from the general estate.*

A man of great wealth, whose family residence consisted of a plot of thirty acres of land, upon which was a dwelling house, with stables, gardens, green houses and other buildings, left a will, the 2d clause of which provided: "*Second.* I give, devise and bequeath to my executors hereinafter named, my dwelling house at Yonkers and the lands, outbuildings and improvements adjacent thereto and in the neighborhood thereof, and the appurtenances as the same shall be in my use and occupation at the time of my decease, To HAVE AND TO HOLD the same, and every part and parcel thereof, to them and their survivors or successors, IN TRUST, to maintain the same as a homestead and permanent residence for my wife and my children during the life of my wife and also after the death of my wife so long as it shall appear to my executors, in view of the interests of my children and of my estate, practicable and desirable to so maintain the same, and I hereby empower my said executors to pay out of my general estate all sums necessary, in their judgment, for keeping said dwelling house, lands, buildings and premises insured and in repair and good order, and also all sums required for the taxes and assessments thereon, and no part of any such sums shall be charged against the income of my wife, or of any child, or against the principal of the share of any child."

This clause of the will also empowered the executors, in their discretion, to sell or lease such family residence at any time they should see fit, providing, however, that the dwelling house and the furniture and effects therein should not be sold during the life of the testator's wife without her consent. Such clause also provided "that the power of alienation of said lands and premises shall not be suspended beyond the term of the life of my said wife and of the youngest of my children who shall be living at the time of my death, and on the termination of said two lives, or of the life of my wife, if I shall leave no child surviving me, I direct that all of said lands and premises be sold by my said executors and the proceeds of sale disposed of according to the provisions hereinafter contained in respect to my residuary estate."

The 8th clause of the testator's will conferred upon the executors and trustees a general discretionary power to sell or lease his real estate, and provided: "In

the power of sale hereby given I include the dwelling house and lands mentioned in the second article of this will, but I request that such power be not exercised unless my executors shall think that for any reason it is undesirable for my wife and family to reside there."

On the first judicial settlement of the accounts of the executors a decree was made directing them to set aside certain securities, " as a fund to provide an income to meet the expenses directed to be defrayed out of the general estate of the testator by the said second article of his will."

The income of this fund being insufficient to enable the executors and trustees to maintain the property in a condition similar to that in which they found it, in order to prevent its deterioration and preserve its salability, the executors and trustees, acting under the advice of counsel, used, in addition to the income of the maintenance fund, a portion of the principal of that fund and a portion of the general estate.

*Held*, that the trust created by the 2d clause of the will with respect to the family residence was an active and not a passive trust, and was valid;

That the executors were empowered to maintain the homestead in the manner in which it was maintained by the testator in his lifetime, and that the expenditures made by them for this purpose should be paid out of the general estate;

That the decree of the Surrogate's Court setting aside the fund for the maintenance of the family residence was a valid exercise of the surrogate's power, and that, as long as such decree remained in force, the executors were bound to use only the income of the fund for the maintenance of the family residence;

That, the executors having improperly used a portion of the principal of the fund for that purpose, it was their duty to restore such portion, and that they might make the restoration out of any property of the general estate remaining in their hands.

CROSS-APPEALS by John A. Stewart and others, as trustees under the last will and testament of John B. Trevor, deceased, and others, from a decree of the Surrogate's Court of the county of Westchester, entered in said Surrogate's Court on the 24th day of May, 1902, settling an intermediate accounting of the above-named trustees.

*John Notman*, for the trustees, appellants, respondents.

*Edward E. Sprague*, for the appellants, respondents, Emily N. Trevor and others.

*Ernest A. Bigelow*, special guardian for the Trevor infants, respondents, appellants.

*J. Mayhew Wainwright*, special guardian for the Winthrop infants, respondents, appellants.

Goodrich, P. J. :

Appeal comes to this court from a decree of the Surrogate's Court of Westchester county, entered upon an intermediate accounting of trustees under the last will of John B. Trevor, deceased, adjudging that the trustees must be surcharged with certain items expended by them over and above the income yielded by a certain trust fund known as the Glenview maintenance fund, set apart by the surrogate of Westchester county in 1892, upon the first judicial accounting of the executors of the will " as a fund to provide an income to meet the expenses directed to be defrayed out of the general estate of the testator by the second article of his will, such securities, property and moneys to be held by said trustees for the purposes aforesaid, and subject to a future accounting therefor."

The testator, John B. Trevor, died in 1890, leaving a will which was probated before the surrogate of Westchester county in 1891. He was a man of great wealth, his personal estate alone exceeding $9,000,000. He occupied, as his family residence, Glenview, which consisted of a plot of thirty acres of land on the Hudson river, at Yonkers, upon which was a large dwelling house, with stables, gardens, green houses and other buildings. His will contained the following clauses which are involved in our discussion of the questions arising upon this appeal :

" Second. I give, devise and bequeath to my executors hereinafter named, my dwelling house at Yonkers and the lands, outbuildings and improvements adjacent thereto and in the neighborhood thereof, and the appurtenances as the same shall be in my use and occupation at the time of my decease, To Have and to Hold the same, and every part and parcel thereof, to them and their survivors or successors, In Trust, to maintain the same as a homestead and permanent residence for my wife and my children during the life of my wife and also after the death of my wife so long as it shall appear to my executors, in view of the interests of my children and of my estate, practicable and desirable so to maintain the same, and I hereby empower my said executors to pay out of my general estate all sums necessary, in their judgment, for keeping said dwelling house, lands, buildings and premises insured and in repair and good order, and also all sums required for the taxes and assessments thereon, and no part of any such sums shall be charged against the

income of my wife, or of any child, or against the principal of the share of any child, but I empower my said executors, in their discretion, to sell and convert into money all or any part of the lands which are the subject of the devise hereinbefore made, either in parcels or as a whole, and at such time or times and on such terms as they shall think best; it being my intention and my will in respect to the said homestead and all the said lands and premises that whenever, in the judgment of my executors, it shall appear to be for the interest of my estate and of my wife and children, or of my children after my wife's death, to sell the same, they shall have full power and authority to make such sale and the like power and authority to sell any part or parcel of the said lands and premises, from time to time, except that the dwelling house and the furniture and effects therein shall not be sold during the life of my said wife without her consent in writing expressed by her uniting in any deed of conveyance and bill of sale thereof. I also empower my said executors in their discretion to lease the said homestead or dwelling house with part of the land for such term and at such rent as they may think best. It is further my will, and all the provisions hereinbefore contained are subject to this direction, that the power of alienation of said lands and premises shall not be suspended beyond the term of the life of my said wife and of the youngest of my children who shall be living at the time of my death, and on the termination of said two lives, or of the life of my wife, if I shall leave no child surviving me, I direct that all of said lands and premises be sold by my said executors and the proceeds of sale disposed of according to the provisions hereinafter contained in respect to my residuary estate."

"*Eighth.* I hereby authorize and empower my executors and trustees hereinafter named to sell and convey any real or personal estate of which I may die seized or possessed at public or private sale and on such terms as they may think best, and to execute sufficient deeds of conveyance and bills of sale thereof, also to lease any such real estate from year to year or for any term of years, or for any shorter time, and until a sale thereof, to receive the rents, issues and profits thereof, also with any money belonging to my estate or with the moneys recovered or received on any policy of insurance to build or rebuild any buildings on my estate in the place of any which may be destroyed by fire or which it may otherwise become necessary

or advisable to rebuild, and also to improve any of my real property by building thereon. Also, in their discretion, to purchase and hold as a portion of my estate any part of any real estate in which I may at the time of my death hold any interest in common with James B. Colgate, or any other person. In the power of sale hereby given I include the dwelling house and lands mentioned in the second article, of this will, but I request that such power be not exercised unless my executors shall think that for any reason it is undesirable for my wife and family to reside there."

"*Fourteenth* [in part]. Whenever I have given a discretion to my executors or trustees, it is my intention that it shall be exercised by them as fully and absolutely as I could exercise discretion myself, if living, in respect to the matter to which such discretion is to be exercised."

The evident intention of the testator, derivable from these paragraphs, was that the executors should maintain Glenview out of the general funds of the estate as a "homestead and permanent residence" for his family during their discretion, and upon the general lines of its maintenance during his lifetime, with power in their absolute discretion at any time to sell the property or any part of it, except that it was not to be sold during the life of his wife without her consent. But the executors could lease the homestead with part of the land for such rents as they deemed best. They were empowered to sell and convey or to lease all or any part of the estate, including by specific mention the homestead.

In 1892, on their first judicial accounting, and in consequence of certain objections by one of the beneficiaries under the will, the trustees set aside securities aggregating $124,000, which, pursuant to a decree of the Surrogate's Court, were reserved "as a fund to provide an income to meet the expenses directed to be defrayed out of the general estate of the testator by the said second article of his will."

By reason of increased taxes and additional repairs the trustees were unable to meet the expenses of keeping Glenview "in repair and good order," as they construed those terms, out of the income of the fund, and asked the opinion of Mr. Stephen P. Nash, an eminent lawyer, and were advised by him that it was their duty to maintain the property out of the general estate in a condition simi-

SECOND DEPARTMENT, NOVEMBER TERM, 1903.        [Vol. 88.

lar to that in which they had found it, in order to prevent its deteri-
oration and preserve its salability. This course has been pursued,
and the account before us shows that their expenditures during the
period of six years since the last accounting have exceeded the
income by $28,151.02, of which $18,000 has been taken from the prin-
cipal of the Glenview maintenance fund and $12,500 from the gen-
eral funds in their hands as executors.

The special guardians allege that while up to 1895 the trustees
had only expended the income of the fund, thereafter they "made
a radical departure from their former practice of charging to the
fund only taxes, insurance and repairs, and had, for the period cov-
ered by the present accounting, charged to the fund gardeners'
wages, amounting to over $23,000, and large sums for water taxes
and coal," thus causing the deficit shown by the account. Their
first contention is that this accounting is not that of executors *qua*
executors for the general estate of the testator, but as trustees
accounting for a special fund, called the Glenview maintenance
fund, set apart to them by the decree of 1892, and that by the
express terms of that decree they are bound to preserve intact the
principal of the fund. It may be conceded that the accounting is
of that nature, but none the less does it involve the question of the
power of the executors to use the principal of that fund, or any
other portion of the general estate, to carry out the intention of
the testator as expressed in the will.

There is no appeal from the decree of 1892, and it must be con-
sidered as final upon the trustees so far as to justify a requirement
that they should use the income only, and not the principal of that
particular fund, for the purposes for which it was set apart. The
present decree orders them "to restore to and pay into the principal
of the said trust fund" the sum of $15,651.02, and to this extent
the decree must be affirmed, inasmuch as it is founded on, and is
consonant with, the decree of 1892. But this does not involve the
principal question before us.

The decree further orders the trustees to "restore to and pay
back to the general estate of the testator the sum of $12,500 bor-
rowed from the said general estate and expended by the trustees as
aforesaid." If, as claimed by the special guardians, the present
accounting is merely an accounting *qua* trustees of the Glenview

maintenance fund, it was not within the jurisdiction of the surrogate to adjudicate the question of the power of the executors to pay the expenses of maintaining the homestead out of the general estate, except so far as to order the trustees to restore to the Glenview fund the amount in which the principal had been depleted.

As a question may arise as to the sources from which the executors are to provide the moneys necessary to restore the Glenview fund, it becomes essential to consider the duty of the executors in regard to the homestead as manifested by the language of the will and the conditions to which it refers. In the first place, it was the residence of the testator and his family. He evidently intended it to be the homestead of his surviving family. He devised to the executors what he described as his "dwelling house, * * * lands, outbuildings and improvements adjacent thereto and in the neighborhood thereof, and the appurtenances as the same shall be in my use and occupation at the time of my decease, * * * to maintain the same as a homestead and permanent residence (for the family), * * * and * * * to pay out of my general estate all sums necessary, in their judgment, for keeping said dwelling house, lands, buildings and premises insured and in repair and good order." The testator could hardly have used stronger language to indicate that he intended that the conditions which had existed during his lifetime should continue to exist after his death, and that what he had been accustomed to do during his lifetime his executors should do after him, in the maintenance of the home which he had prepared for himself and for his family after his death. This man of many millions chose to spend large sums in gardens and lawns, hothouses and gardeners, to beautify his home and enable him and his family to enjoy its fruits; and there can be no question that he intended that his family after his death should continue in the same enjoyment in just the same manner as he and they had enjoyed it during his life, and that his executors should pay the necessary expense therefor out of his general estate.

In *Bowes* v. *Strathmore* (8 Jur. pt. 1, p. 92) the language employed by the testator was not as strong as in the case at bar. He directed the trustees to "keep and preserve in good repair, order and condition my said castle, capital messuage or mansion house called Streatlam Castle, and also my capital messuage or mansion house called

Gibside, and the offices, park, chapel, ornamental buildings, gardens, pleasure grounds and appurtenances thereto belonging  *  *  *. and upon trust that during the minority of my said son  *.  *  * the said trustees  *  *  * shall generally superintend the management of the same manors, hereditaments and premises and appoint stewards, bailiffs, agents and collectors with such salaries and allow_ ances as they the said trustees  *  *  * shall think proper." The trustees erected farm houses and buildings, made extensive drains and fences, sunk wells, provided pumping apparatus, constructed bridges and made roads, and the court approved their expenditures for these purposes.   The vice-chancellor said the question was whether under another clause of the will which provided that the trustees "shall generally superintend the management of the same manors, hereditaments and premises  *  *  * as they  *  *  * think proper," the trustees had not general authority to do the acts enumerated, and added (p. 94):  " I cannot but myself think, that the testator, when he gives a general power to superintend and manage, he gives a general power without a limit, that is, according to the discretion of the trustees ; and unless it appears that what they did in the exercise of the power to superintend and manage was really not a fair exercise of the discretion, it appears to me, of necessity, the court must uphold what they have done, so far as I understand it."

The present will in the clauses quoted above confers upon the executors powers as broad, as those referred to by the vice-chancellor in the case cited.   All of the items in the account to which objection is made come within the necessary expenses for maintaining the property as a homestead for the family in the manner in which it was maintained by the testator in his lifetime and keeping it in a salable condition if the executors should decide to sell.   They were expended by the trustees under professional advice in complete good faith, and such expenditure should be sustained as accordant with the intent of the testator.

The learned surrogate expresses the opinion that the trust created by the 2d paragraph of the will is a passive trust, and, therefore, invalid, and cites in support of this doctrine the case of *McComb* v. *Title Guarantee & Trust Co.* (36 Misc. Rep. 370 ; affirmed without opinion by the Appellate Division of the first department, 70 App. Div. 618). · In that case the will gave the testator's home-

stead to the executors in trust for the use of the testator's wife and children, and authorized the executors to maintain and keep the same in good order and repair, with a provision that the same might be sold with the consent of the wife and children..

The Trevor will differs materially from the McComb will, in that it did not give Glenview to the executors to the use of the wife and children, but gave it to the executors to be maintained by them as a homestead for the wife and children, with absolute power to the executors to lease or sell the premises or parts thereof when it should appear to them to be for the interest of the estate, either before or after the death of the wife and children, except that it was not to be sold in the wife's lifetime without her consent. But even this latter provision is subject to the provision of the 8th paragraph, which specifically includes the homestead within the general power of the executors to sell the testator's estate if they shall think it undesirable for his wife and family to reside there. Mr. Anderson, in his valuable Dictionary of Law (at p. 1057), well defines an active and a passive trust : " Active trust. When the trustee is not merely a passive depositary of the estate, but is required to take active measures to carry into effect the general intention of the creator of the trust ; as, a trust by which an executor is to sell property and apply the proceeds as directed. Also called a special trust. Passive trust. Requires nothing to be done by the trustee beyond transferring property to the beneficiary ; in this respect corresponding to the ancient ' use.' Also called a barren, dry, naked, or simple trust."

· It is apparent that the trust under consideration is that defined by Mr. Anderson as an active and not as a passive trust. Certainly the executors had other powers than transferring the title to the beneficiary. Expressive language on this subject may be found in *Beekman* v. *Bonsor* (23 N. Y. 298), where it was said (p. 314) : " I am of opinion that this clause was intended to create an express trust to-receive the rents and profits of land, and apply them to the use of the beneficiaries designated ; and, consequently, that the trust, in its nature and kind, is permitted by our statute of uses and trusts. * * * No technical or precise words are necessary in order to constitute such a trust. If the direction is such as to vest the title in the trustee ; if his duties are active instead of passive ; and if the

possession is subjected to his control, so that he may, in his pleasure or discretion, exclude the beneficiary therefrom; and if, with these directions, there is no other declared purpose of the testator, a trust to receive the rents and profits is the necessary result of the arrangement." All of these directions are contained in the Trevor will. The title is vested in the trustees; the duties are active, not merely passive; the possession of the premises is subject to their control; they can exclude the beneficiaries. Besides and above all, they can lease or sell the property or any part of it, and to this end keep the premises in salable order. All of these are active duties and forbid and prevent passivity in the trust.

We reach the conclusion that the trust is an active and valid trust and not a passive trust; that the trustees have made only such expenditures as they were authorized by the will to make; that these expenses were to be paid out of the general estate; that the setting apart of the $124,000 of securities by the decree of 1892 was a valid exercise of the power of the Surrogate's Court and was intended for the protection of the trustees and to insure the family's occupation of the homestead; that so long as that decree remains in force and not vacated the trustees are bound to use only the income of those securities for maintaining Glenview; that the trustees must restore to that fund the sum of $18,000. and that they may make such restoration out of any property of the general estate which remains in their hands.

The decree must be modified in accordance with this opinion, and as modified affirmed, with costs to each party payable out of the estate.

HIRSCHBERG, JENKS and HOOKER, JJ., concurred; BARTLETT, J., concurred in result.

Decree of the Surrogate's Court of the county of Westchester modified in accordance with the opinion of GOODRICH, P. J., and as modified affirmed, with costs to each party payable out of the estate.