## Grimes' Executors v. Harmon and Others.

CHARITABLE USE.—*Will.*—The residuary clause of a will was as follows : "Item. I give and bequeath the residue of my estate, after the foregoing bequests have been fully paid, to the orthodox protestant clergymen of Delphi and their successors, to be expended in the education of colored children, both male and female, in such way and manner as they may deem best, of which a majority of them shall determine; my object in this bequest being to promote the moral and religious improvement and well being of the colored race."

No organized or corporate body known as the orthodox protestant clergymen of Delphi existed at the time of the execution of the will or afterwards. *Held*, in a suit by the heirs at law of the testator against his executors, that said residuary clause was void at law for vagueness and uncertainty, and incapable of judicial enforcement by a court of chancery possessing only the ordinary powers of a court of equity, and therefore could not be sustained by the courts of this State.

CHARITABLE USES.—*Cy Pres Power.*—*Prerogative.*—The power possessed by the court of chancery in England in reference to charitable uses, so far as it differs from the power exercised by that court in other cases of trust, does

Grimes' Executors *v.* Harmon and Others.

not belong to that court as a court of equity, nor is it a part of its judicial power and jurisdiction, but it is a branch of the prerogative power of the king as *parens patriæ*, which he exercises by the chancellor.

SAME.—*Prerogative Power.— Whence Derived.—Statute of 43 Elizabeth.*—This prerogative power was derived directly from the king under his sign-manual, and was not conferred on the court by the statute of 43 Elizabeth, commonly called the Statute of Uses, but was exercised by the court before the passage of that act, which created no new law or new objects of charity, but only provided a new remedy for existing rights, by creating a new and ancillary jurisdiction by commission, and which was local to the kingdom of Great Britain.

SAME.—*Power of Courts of this State.*—The courts of this State, possessing no prerogative power, and being incapable of administering and enforcing the remedy provided in England by the statute of 43 Elizabeth, have only judicial power, and can only exercise in reference to charitable uses and trusts such power and jurisdiction as was and is possessed and exercised by the court of chancery in England acting as a court of equity.

SAME.—The *cy pres* power, which constitutes the peculiar feature of the English system, and is exerted in determining gifts to charity, where the donor has failed to define them, and in framing schemes of approximation near to or remote from the donor's true design, is unsuited to our institutions, and has no existence in the jurisprudence of this State on this subject.

SAME.—A devise or grant to a corporation capable of holding, or to a person or persons, either by name or so described that they can be readily ascertained, for a definite and specific use, is good at law; and the powers of a court of chancery are confined to the mere execution of the trust, to secure the faithful application of the fund or property to the use and object indicated in the deed or will; in other words, to carry out the intention of the grantor or testator as thus expressed.

SAME.—*What Constitutes a Charitable Use.*—To constitute a charitable use, there must be a donor, a trustee competent to take, a use restricted to a charitable purpose, and a definite beneficiary. Where, in case of a grant or devise, no party or parties are designated who can take the property, or where they are so uncertain that the court cannot direct intelligibly the execution of the trust, the property remains undisposed of and falls to the heir or next of kin. A court of chancery, always acting for the beneficiaries, stops the instant it ascertains that there are none, or that they are so uncertain that it will have to act in the dark when it sets about application of the trust.

SAME.—*When Court of Chancery will Interpose.*—The jurisdiction of the court of chancery is not to create a trust. Its powers in this country are merely to direct the execution of the donor's intention, and to prevent the object from being deprived of the benefit intended. The court, in all of its doings, represents the persons, institutions, and classes who are to be benefitted. It interposes for the beneficiaries alone; and when invoked by the trustees it is only that they require the interposition of the court to effect the purpose and to secure to the beneficiaries the charity of which they should be the just recipients.

SAME.—*Uncertain Beneficiaries.*—A gift to charity is maintainable in this State, if made to a competent trustee, and so defined that it can be executed as made by the donor by a judicial decree, although the beneficiaries are not designated by name or specifically pointed out, if the trustee is invested with full and ample discretion to select the beneficiaries of such charity from a class of persons named; but where the beneficiaries are described as the children, both male and female, of a certain race in the United States, and where that race consists within the United States of about four million persons, it is impracticable to ascertain the beneficiaries and to distribute the proportionate share of such fund to each of such beneficiaries; and where, in such case, the trustees have no discretionary power to select the beneficiaries from the class named, the gift is void for vagueness and uncertainty.

SAME.—There is no difference whether a devise or bequest be immediate to an indefinite object or to a trustee for the use and benefit of an indefinite object. If it be immediate to an indefinite object, it is void; and if it be a trust for an indefinite object, the property that is the subject of the trust is not disposed of, and the trust results to the benefit of those to whom the law gives the property in the absence of any other disposition of it by the testator or donor.

SAME.—*Trustees with Discretion to Select Beneficiaries.*—If the charity does not fix itself upon any particular object, but is general and indefinite, such as the promotion of the moral and intellectual condition of a race, or the relief of the poor, and no plan or scheme is prescribed, and no discretion is lodged by the testator in certain and ascertainable individuals, it does not admit of judicial administration. In such a case, in England, the administration of the charity is cast upon the king, to be executed *cy pres*, while in this country the property devised lapses to the next of kin. If, however, in such a case, certain and ascertainable trustees are appointed with full powers to select the beneficiaries and devise a scheme or plan of application of the funds appropriated to the charitable object, the court will, through the trustees, execute the charity.

SAME.—*Supplying Trustees.*—Where trustees capable of taking the legal estate have been appointed originally, so that a valid use has been in the first instance raised, and the case has been thus brought within the jurisdiction of the court of chancery, that court will supply any defect which may arise in consequence of the death or disability of the trustees or their refusal to act, by appointing new trustees in their place; but where no competent trustees have been in the first instance appointed, so that no legal estate has ever vested, no use has been raised, and the court of chancery has acquired no jurisdiction of the case.

WILL.—*Construction.*—It is a well settled rule, that all the parts of a will are to be construed together and in relation to each other, so as, if possible, to form one consistent whole; and that words and limitations may be transposed, supplied, or rejected, where warranted by the immediate context or the general scheme of the will, but not merely on conjectural hypothesis of the testator's intention, however reasonable, in opposition to the plain and obvious sense of the language of the instrument; and such a construction should be placed upon

the will as to sustain and uphold it in all its parts, if this can be done consistently with the established rules of law and construction.

SAME.—*Parol Evidence.*—*Mistake.*—*Ambiguity.*—The general rule is, that parol evidence of the intention of a testator is inadmissible for the purpose of explaining, contradicting, or adding to the contents of a will, but that its language must be interpreted according to its proper signification, or with as near an approach thereto as the body of the instrument and the state of circumstances existing at the time of its execution will admit of. The doctrine in reference to mistakes in wills is, that courts of equity have jurisdiction to correct them when they are apparent upon the face of the will; but they must be so apparent, and must be such as may be made by a proper construction of the terms of the will; otherwise there can be no relief. Parol evidence, or evidence *dehors* the will, is not admissible to vary and control the terms of the will, although it is admissible to remove a latent ambiguity.

CHURCH.—*Jurisdiction of Courts over.*—Over the church, as such, the legal tribunals do not have, or profess to have, any jurisdition whatever, except to protect the civil rights of others and to preserve the public peace. All questions relating to the faith and practice of the church and its members belong to the church judicatures to which such members have voluntarily subjected themselves. But the civil courts will interfere with churches and religious associations and determine upon questions of faith and practice of a church where rights of property and civil rights are involved.

CASES OVERRULED.—*Statute of* 43 *Elizabeth.*—So far as the cases of M'Cord *v.* Ochiltree, 8 Blackf. 15; Sweeney *v.* Sampson, 5 Ind. 465; and The Common Council of Richmond *v.* The State, 5 Ind. 334, decide that the power and jurisdiction of the courts of this State have been enlarged by the statute of 43 Eliz., and that such statute can be executed in this State, they are overruled.

APPEAL from the Carroll Common Pleas.

BUSKIRK, J.—The appellees filed in the court below, on the 8th day of January, 1868, their complaint against the appellants, in which the following facts are stated: that Samuel Grimes, on the 31st day of August, 1864, executed his last will and testament, at the city of Baltimore, and State of Maryland; that he departed this life at said city, on the 2d day of September, in the year 1864; that at the time of his death he was a *bona fide* resident of the city of Delphi, county of Carroll, and State of Indiana; that the said decedent departed this life without issue, leaving neither father nor mother nor wife surviving him; that the plaintiffs are his heirs at law; that the said decedent departed this life the owner of about eight thousand dollars worth of personal property, and seized

in his own right of a large body of real estate, worth, in the aggregate, about twenty thousand dollars, all of which property was situated in the county of Carroll, and State of Indiana; that said will was duly proved and admitted to probate in the said city of Baltimore and State of Maryland, on the 18th day of November, 1864; that the appellants, who were named in said will as executors thereof, produced to the court of common pleas in said county of Carroll, in the State of Indiana, on the 30th day of January, 1865, a duly authenticated copy of the said will and the probate thereof; that the court, being satisfied that the said instrument ought to be allowed as the last will and testament of the said decedent, ordered the same to be filed and recorded; that the clerk of said court thereupon issued to the appellants letters testamentary, who gave bond, qualified, and entered upon the discharge of their duties as executors of said will; that the said executors had converted the real and personal property of which the said decedent died seized and possessed into money; that they had in their hands cash assets, the proceeds of the sale of the said real and personal property, amounting to about thirty thousand dollars; that the bequests in the said will to Lany G. Beck, Alice J. Beck, Jennie Beck, Fannie Beck, and Walter Beck, children of Dr. E. W. H. Beck, have all been fully paid by the said executors; that the plaintiffs, then and there, waived all right to recover the same back and all relief whatever, either as against said executors or those to whom they had paid said legacies; and that said will was void, for the following reasons, namely:

"Because, as they aver and expressly charge, there existed at the time when the said pretended will was executed, no organized or corporate body known as 'the orthodox protestant clergymen of Delphi,' in the county of Carroll, and State of Indiana, or elsewhere. Nor does there now, nor has there at any time since the execution of the said pretended will existed any such organized or corporate body; and also, because the terms used in the will, 'colored children' and

'colored race,' are so vague on account of their universality, that it is impossible to ascertain who the testator intended should be the objects of his charity; wherefore, inasmuch as no person or persons are designated who should select or appoint the beneficiaries under the will, and the will itself fails to designate such beneficiaries with any degree of precision, and also omits to prescribe the mode in which the charity shall be distributed or applied, the plaintiffs aver that the said will is void for uncertainty, and impracticable of execution so far as the bequests in behalf and for the benefit of 'colored children' of the 'colored race' are concerned."

The second paragraph of the complaint contained the same allegations as the first, with the additional one that the said decedent was at the time of the execution of the said will of unsound mind and incapable of making a will.

The prayer of the complaint was as follows:

First, that the probate of the said will should be revoked and set aside.

Second, that the said will be declared void and held for nought, and that said plaintiffs be admitted to the inheritance of the estate, real and personal, of which the said Samuel Grimes died seized and possessed.

Third, that the letters testamentary issued by the order of the court to the defendants be set aside and held as nought.

Fourth, that the said defendants be enjoined from further interfering with said decedent's estate.

Fifth, that the defendants as such executors be required to pay into court all moneys in their hands belonging to the estate of the said decedent.

The appellants demurred to the first paragraph, and answered the second in the nature of confession and special denial. The demurrer to the first paragraph was overruled, and an exception taken. The appellants refused to answer further to the first paragraph, and final judgment was rendered for the appellees upon that paragraph. The parties in open court waived a trial upon the issues formed upon the

second paragraph of the complaint and the answer thereto. The appellants prosecute this appeal to obtain a reversal of the judgment rendered in favor of the appellees and against the appellants upon the demurrer to the first paragraph of the complaint.

The will was made a part of the complaint. The testator, after making several bequests to the children of Dr. E. W. H. Beck, disposed of the residue of his estate as follows:

" Item. I give and bequeath the residue of my estate, after the foregoing bequests have been fully paid, to the orthodox protestant clergymen of Delphi, and their successors, to be expended in the education of colored children, both male and female, in such way and manner as they may deem best, of which a majority of them shall determine; my object in this bequest being to promote the moral and religious improvement and well being of the colored race."

The only error assigned is based upon the action of the court in overruling the demurrer to the first paragraph of the complaint. Was this ruling correct?

It is maintained with great earnestness and ability by the learned counsel for the appellants that the will of the said decedent was, in all respects, legal and valid, and that the bequest contained in the residuary clause is capable of being executed by the courts.

It is maintained with equal earnestness and ability by the learned counsel for the appellees, that the residuary clause of said will is void for uncertainty and incapable of execution for two reasons: First, that there is no trustee legally competent to take and hold the property. Secondly, that the use is not clearly defined. The first objection affects the trust, and the other the use. Charitable uses, like all other uses, comprise a trust as well as a use. To constitute a valid use, there must be, in all cases, first, a trustee legally competent to take and hold the property; and secondly, a use for some purpose clearly defined.

It is true that where trustees capable of taking the legal estate were originally appointed, so that a valid use was in

the first instance raised, and the case was thus brought within the jurisdiction of the court of chancery, that court would not afterwards suffer the use to fail, but would supply any defect which might arise in consequence of the death, disability, or refusal of the trustees to act, by appointing new trustees in their place; but when no competent trustees were in the first instance appointed, so that no legal estate ever vested, of course no use was raised, and the court of chancery acquired no jurisdiction of the case.

The law upon this subject is well stated by the court of appeals of the State of New York, in the case of *Downing* v. *Marshall*, 23 N. Y. 366, where it is said: "And, first, we think that the residuary devise and bequest were void as to the unincorporated Home Missionary Society. That society is composed of a fluctuating and unascertained class of persons having no legal capacity to take the gift. The beneficiaries are the entire community within the influence of the society. There is no trustee competent to take the fund so as to secure its appropriation to the benevolent purpose intended. That such a gift is void according to legal rules, it needs no argument to prove. There is no trustee, and there are no beneficiaries ascertained, either as individuals or as a class of persons. These objections are fatal. It is said that a trust shall never fail for the want of a trustee, because a court of equity will supply the defect. But this is true only of a valid trust, and in order to be valid, it must be so constituted that a title can vest in some person, natural or artificial, by force of the gift itself. The principles on which this question depends have heretofore been fully examined by this court. A charitable donation, precise and definite in its purpose, void at law because the benficiaries are unascertained, may be maintained if there be a competent trustee to take the fund and effectuate the charity. If there be no such trustee it fails, and the heir or next of kin is entitled. (*Williams* v. *Williams*, 4 Seld. 525; *Owens* v. *The Missionary Society*, 4 Kern. 380; *Beekman* v. *Bonsor, ante*, 298.) It is true in the present case, that according to the dispositions

made by the testator the executors were appointed devisees and legatees in trust, but they were not constituted trustees of the charity. The objects of the charity were mankind in general, or that portion of mankind within the sphere of the missionary labor carried on by the society. It had no trustees except the unincorporated persons forming the society itself. The duty of the executors would be fully performed by paying over the income, and ultimately the principal, of the fund to any agent of those persons. Those persons were a fluctuating body unknown to the law, irresponsible to the courts, and incapable of receiving a gift even for a purpose which the law may denominate charitable."

It was said by this court, in *M'Cord* v. *Ochiltree*, 8 Blackf. 15, that, "The legacy in controversy is void at law, because the objects of the testator's benevolence, pious, indigent youths preparing for the ministry of the gospel according to a particular standard of faith, are too vaguely indicated to enable them to take the legacy without the interposition of a trustee; and because there was, at the death of the testator, no existing trustee capable of executing the trust intended to be created by the will. The Theological Seminary, being at that time an unincorporated society, could not execute a trust of that character, being the application of a permanent fund to a particular purpose, for the want of succession."

. It was held in *Beekman* v. *Bonsor*, 23 N. Y. 298, that, "A gift to charity which is void at law for the want of an ascertained beneficiary will be upheld by the courts of this State, if the thing given is certain, if there is a competent trustee to take the fund and administer it as directed, and if the charity itself be precise and definite."

Let us apply these principles of law to the case under consideration, and see whether there is a legal trustee and an ascertained, precise, and definite beneficiary. The appellants were by the testator appointed the executors of his will, with power to convert his real and personal property into cash, but they were not constituted the trustees of the charity.

Their duties will end when they pay the money over to the persons charged with the execution of the trust. So they cannot be regarded as trustees. The devise is to the orthodox. protestant clergymen of Delphi. It is. averred in the complaint, and admitted by the demmurrer, that at the time when the will was executed and when the testator departed this life there did not exist in the town of Delphi an organized voluntary or corporate body known as "The orthodox protestant clergymen of Delphi."

This being admitted, it necessarily results that there was no artificial trustee in existence competent to execute the trust.

But is is maintained by the appellants that the testator intended that his trust should be executed by natural persons, and not by an organized or corporate body. Did the testator intend to designate natural persons by the phrase "The orthodox protestant clergymen of Delphi," as contradistinguished from an associated or corporate body?

It is a well settled rule of construction, that all the parts of a will are to be construed together and in relation to each other, and so as, if possible, to form one consistent whole, and that words and limitations may be transposed, supplied or rejected, where warranted by the context or the general scheme of the will, but not merely on a conjectural hypothesis of the testator's intention, however reasonable, in opposition to the plain and obvious sense of the language of the instrument. 1 Redf. on Wills, 430. It is our duty to place such a construction upon the will as will sustain and uphold it in all its parts, if it can be done consistently with the established rules of construction of the law.

It seems quite evident to the court that the testator looked to and contemplated a perpetuity, by using the phrase "and their successors;" and it is equally clear that he intended that his trust should be executed by associated action, by providing that a majority of the persons designated as orthodox protestant clergymen of Delphi should determine the manner of its execution. If the court can determine, by

the established and well settled rules of construction, from the language employed in the instrument, which was intended, an organized or incorporated body or natural persons, it is required by the law to do so. But suppose that the court is unable by construction to determine which was meant, would it be competent to receive parol evidence to show which was intended?

Ambiguities are of two kinds, patent and latent. A patent ambiguity is one which appears on the face of the instrument, that which occurs when the expression of an instrument is so defective that a court of law which is obliged to put a construction upon it, placing itself in the situation of the parties, cannot ascertain therefrom the parties' intention.

A latent ambiguity is, 'one which arises from some collateral circumstance, or extrinsic matter, in cases where the instrument is itself sufficiently certain and intelligible. Bouvier's Law Dictionary.

The ambiguity in the case under consideration arises upon the face of the instrument. It is therefore a patent ambiguity, and the law is well settled that it cannot be explained by extrinsic evidence *dehors* the will, while a latent ambiguity may be explained by extrinsic parol evidence. See *Mann* v. *Mann's Ex'rs.*, 1 Johns. Ch. 231; *McAlister* v. *Butterfield*, 31 Ind. 25; *Jackson* v. *Payne's Ex'rs.* 2 Met. Ky. 567; *Worthington* v. *Hylyer*, 4 Mass. 196; 1 Jarman on Wills, 315; 2 Redfield on Wills, 398; *Mellish* v. *Mellish*, 4 Ves. 45; 1 Story Eq. secs. 179, 183.

In *Jackson* v. *Payne's Ex'rs.*, *supra*, the court say: "The general rule is, that parol evidence of the intention of a testator is inadmissible for the purpose of explaining, contradicting or adding to the contents of a will; but that its language must be interpreted according to its proper signification, or with as near an approach thereto as the body of the instrument and the state of circumstances existing at the time of its execution will admit of. The doctrine in regard to mistakes in wills is, that courts of equity have jurisdiction to correct them when they are apparent upon the face of the

will. But the mistakes must be apparent upon the face of the will, and must be such as may be made out by a proper construction of its terms, otherwise there can be no relief. Parol evidence, or evidence *dehors* the will, is not admissible to vary or control the terms of the will, although it is admissible to remove a latent ambiguity."

In *Mellish* v. *Mellish, supra,* the master of the rolls said: "The rule is, that whenever there is a clear mistake or a clear omission, recourse is to be had to the general scope of the will, and the general intention to be collected from it, and that there is a mistake. I do not find enough to convince me that there is a mistake, and whenever it comes to be a doubt, the safest way is to adhere to the words."

But suppose there is in the will under consideration such an ambiguity as can be explained by extrinsic parol evidence, by what rule is the court to be governed in ascertaining the persons intended to act as trustees? It is admitted that there was no organized or corporate body in existence answering to the description of "the orthodox protestant clergymen of Delphi;" consequently there was no artificial body competent to take and act as trustees.

On the other hand, if he intended that natural persons should act as trustees, they are not designated by their proper names. They are referred to as a class of persons possessing certain qualities and entertaining certain beliefs. They have to be, not only protestants, but orthodox. The word protestant, as used in the will, evidently embraces all religious persuasions which deny the pretensions of the church of Rome to apostolic succession and to infallibility. The word orthodox, as applied to religious matters, is defined by Webster to mean, "sound in christian faith, believing in the genuine doctrines taught in the scriptures."

The competency of the persons to act as trustees is not made to depend upon whether they belonged to any particular church or religious denomination, but it is made to depend upon whether they are orthodox in faith. It is very

evident that the testator did not regard all protestants as being orthodox, for if he had, his bequest would have been to the protestant clergymen of Delphi, omitting the word "orthodox."

In what manner, and upon what proof, is the court to determine who is orthodox, and who is heterodox? The testator has not established any standard or test by which the court should be governed in determining the question. It is quite obvious that all protestant denominations are not orthodox, for they widely differ from each other upon the most vital and essential principles of the Christian faith. The various protestant denominations do not regard each other as orthodox.

It is maintained by the counsel for the appellees that the courts of this State possess no jurisdiction to hear and determine questions of religious faith.

The importance and magnitude of the question involved in the above proposition cannot be overestimated. In *Chase* v. *Cheney*, 10 Am. Law Reg. (N. S.), 295, the Supreme Court of Illinois say: "In this unhappy controversy is involved a grave question, and of deeper moment to all Christian men; indeed, to all men who believe that Christianity, pure and simple, is the fairest system of morals, the firmest prop to our government, the chiefest reliance in this life, and the life to come. Shall we maintain the boundary between church and state, and let each revolve in its respective sphere, the one undisturbed by the other? All history warns not to rouse the passion or wake up the fanaticism which may grapple with the state in a deathly struggle for the supremacy.

"Our constitution provides that the 'free exercise and enjoyment of religious professions, and worship, without discrimination, shall forever be guaranteed.' In ecclesiastical law, profession means the act of entering into a religious order. Religious worship consists in the performance of all external acts and the observance of all ordinances and ceremonies, which are engaged in with the sole and avowed object

of honoring God. The constitution intended to guarantee from all interference by the State, not only with each man's religious faith, but his membership in the church, and the rights and discipline which may be adopted. The only exception to uncontrolled liberty is, that acts of licentiousness shall not be excused, and practices inconsistent with the peace and safety of the State shall not be justified. Freedom of religious profession and worship cannot be maintained if the civil courts trench upon the domain of the church, construe its canons and rules, dictate its discipline, and regulate its trials."

In *Gartin* v. *Penick*, in the court of appeals of Kentucky, 9 Am. Law .Reg. (N. S.,) 210, Judge ROBERTSON, who delivered the opinion of the court, said: "Christianity, though an essential element of conservatism, and a great moral power in the state, should work by love, and inscribe the laws of liberty and light on the heart; and civil government has no just or lawful power over the conscience, or faith, or form of worship, or church creeds, or discipline, as long as their fruits neither unhinge civil supremacy, demoralize society, nor disturb its peace or security."

We have no state religion. The constitution of our State provides, that "all men shall be secured in their natural right to worship Almighty God according to the dictates of their own consciences." The law knows and can make no distinction between protestant and catholic. Orthodox and heterodox are alike under the protection of the law.

Judge COOLEY, in his valuable work on Constitutional Limitations, says: "It is frequently said that Christianity is a part of the law of the land. In a certain sense, and for certain purposes, this is true. The best features of the common law, and especialy those which relate to the family and social relations, which compel the parent to support the child, and the husband the wife, which make the marriage tie permanent and forbid poligamy, have either been derived from, or have been improved and strengthened by, the prevailing religion and the teachings of its sacred book. But the

law does not attempt to enforce the precepts of Christianity on the ground of their sacred character or divine origin. Some of these precepts are universally recognized as being incapable of enforcement by human laws, notwithstanding they are of continued and universal obligation. Christianity, therefore, is not a part of the law of the land, in the sense that would entitle the courts to take notice of and base their judgments upon it; except so far as they should find that its precepts had been incorporated in, and thus become a component part of, the law." Cooley's Const. Lim. 472.

The same learned author in another place says: "Whatever, therefore, may have been their individual sentiments upon religious questions, or upon the propriety of the state assuming any supervision of religious affairs under other circumstances, the general voice has been to make all persons equal before the law, and to leave questions of religious belief and religious worship to be questions between every man and his Maker, which human tribunals are not to take cognizance of, so long as the public order is not disturbed, except as the person himself, by voluntary action in associating himself with a religious organization, may have conferred upon such organization a jurisdiction over him in ecclesiastical matters. These constitutions, therefore, have not established religious toleration merely, but religious equality."

Congress is forbidden, by the first amendment to the constitution of the United States, from making any law respecting an establishment of religion, or prohibiting the free exercise thereof. Mr. Story says of this provision: "It was under a solemn consciousness of the dangers from ecclesiastical ambition, the bigotry of spiritual pride, and the intolerance of sects, exemplified in our domestic, as well as in foreign annals, that it was deemed advisable to exclude from the national government all power to act upon the subject. The situation, too, of the different states equally proclaimed the policy, as well as the necessity, of such an exclusion. In some of the states Episcopalians constituted the predominant sect; in others Presbyterians; in others

Congregationalists; in others Quakers; and in others again was a close numerical rivalry among contending sects. It was impossible that there should not arise perpetual strife and perpetual jealousy on the subject of ecclesiastical ascendancy, if the national government were left free to create a religious establishment. The only security was extirpating the power. But this alone would have been an imperfect security, if it had not been followed up by a declaration of the right of the free exercise of religion, and a prohibition (as we have seen) of all religious tests. Thus the whole power over the subject of religion is left exclusively to the state governments, to be acted upon according to their own sense of justice and the state constitutions; and the Catholic and the Protestant, the Calvinist and the Armenian, the Jew and the Infidel, may sit down at the common table of the national councils without any inquisition into their faith or mode of worship." Story Const., sec. 1879.

The power thus left to the states has been exercised in our State by proclaiming in our organic law religious toleration and religious equality. We hold that there is no test or standard of orthodoxy established by the constitution or laws of our State, and that the courts of this State possess no power to investigate questions of religious faith or belief, or to determine who are orthodox or who are heterodox, except where the rights of property or civil rights are involved.

It was recently held by the Supreme Court of Illinois, in the case of *Chase* v. *Cheney*, 10 Am. Law Reg., (N. S.) 295, that "the civil courts will interfere with churches or religious associations when rights of property and civil rights are involved;" and in support of this doctrine the following cases are referred to: *The Baptist Church* v. *Witherell*, 3 Paige, 296; *Lawyer* v. *Cipperly*, 7 Paige, 281; *Gable* v. *Miller*, 10 Paige, 627; *Miller* v. *Gable*, 2 Denio, 492; *Robertson* v. *Bullions*, 9 Barb. 64; *Diffendorf* v. *Ref. Cal. Church*, 20 Johns. 12; *The German Ref. Church* v. *Seiberi*, 3 Barr, 291; *Shannon* v. *Frost*, 3 B. Mon. 258; *Garten* v. *Penick, supra; Forbes*

v. *Eden*, Law Rep. 1, Scotch & Div. Appeals, 568; *Ferrari* v *Vasconcelles*, 36 Ill. 46.

In *Baptist Church* v. *Witherell, supra,* the court say: "Over the church, as such, the legal tribunals do not profess to have any jurisdiction whatever, except to protect the civil rights of others and to preserve the public peace. All questions relating to the faith and practice of the church and its members belong to the church jurisdictions to which they have voluntary subjected themselves."

In *Ferrari* v. *Vasconcelles, supra,* the court say: "Whilst we will decide nothing affecting the ecclesiastical right of a church, which we are not competent to do, its civil rights to property are subjects for our examination, to be determined in conformity to the laws of the land and the principles of equity."

In all the above cases, where it was held that the civil courts would interfere with churches and religious denominations, when the rights of property and civil rights are involved, except the case of *Chase* v. *Cheney,* the church was asserting a right to property; but we suppose that the principles of law would be the same whether the church or a third party was asserting a right to property, when such right depended upon the question of religious faith.

The testator had the undoubted right to prescribe a standard or test of orthodoxy and heterodoxy; and if he had done so, we can readily see how the court could have heard the proof and determined whether the persons who claimed the right to act as trustees came up to and filled the standard or test as prescribed. There was no testimony offered in the court below to prove, or as tending to prove, that any protestant clergyman of Delphi was orthodox. We will not attempt in advance to determine what evidence would be competent and admissible, or incompetent and inadmissible. What we do decide is, that when rights of property or civil rights, as contradistinguished from ecclesiastical rights, are involved, and such rights depend upon the religious faith or orthodoxy of citizens, or the rules, discipline and practice

of churches or religious denominations, the courts of this State may hear evidence and determine judicially all such questions, so far as they affect the rights of persons or religious denominations to property or civil rights.

But suppose that competent trustees can be ascertained; can they execute the trust? Are the beneficiaries so described that they can be ascertained? And if they can be ascertained, is there any plan or scheme devised by the testator directing the manner in and the purposes for which the money was to be expended? And if there is no plan or scheme, is there a discretion vested in the trustees authorizing them to select the beneficiaries and determine the manner in which the trust should be executed? The beneficiaries are not designated except by the general, vague, and sweeping expression, "colored children, both male and female." We will not stop to inquire whether the expression "colored" was intended to embrace all races except the white, or Caucasian. This is its meaning in common parlance. We will adopt, for the purpose of considering the case, but without deciding that the language employed admits of this limited construction, the construction insisted upon by the learned counsel for the appellants, that the testator had exclusive reference to children of the African race, domiciled in the United States and her territories. The class, then, from which the beneficiaries are to be selected numbers about four millions.

It will be observed that no scheme or plan, such as the foundation of a college, a seminary of learning, or a theological institute, is prescribed. The character of the education to be given—whether moral, religious, literary or scientific— is not prescribed. The purpose expressed is to promote the moral and religious improvement and well being of the colored race by educating the colored children, both male and female, but the particular kind of education is not prescribed. It would be impracticable to distribute the fund ratably among the beneficiaries. There is no power or discretion lodged in any person, natural or artificial, to select the ben-

eficiaries from the mass of children of the African race in this country. Can the courts, in the exercise of their judicial functions, select the beneficiaries? If neither the trustees nor the courts can select the beneficiaries, is not the residuary devise and bequest void for uncertainty?

These questions are discussed with great learning and ability by CHURCH, C. J., in the case of *White* v. *Fisk*, 22 Conn. 31. In that case the following clause of the will under consideration was held void for uncertainty: "Any surplus income that may remain, to the extent of one thousand dollars per annum, I direct to be expended by my trustees for the support of indigent, pious young men preparing for the ministry in New Haven, Connecticut." When the case was heard there were indigent, pious young men in New Haven, Connecticut, preparing for the ministry. CHURCH, C. J., in delivering the opinion of the court, said: "While we acknowledge the benevolent and charitable intention of the testator in this gift, and the laudable purpose he conceived, we cannot see how, confining ourselves within what we believe to be our legitimate powers of interpretation and judgment, we can carry that intention into effect. The legacy is not given to any college or institution, * * * but only as a legal interest to trustees, to be expended or disbursed for the support of individuals, each one of whom falling within the description named has an equitable or beneficial interest in the fund, and which he must have a right to enforce if any one can. And who are these individuals? They are the indigent, pious young men preparing for the ministry in New Haven. The difficulty of carrying this provision into effect is as great as if no trustee had been appointed; for no rule of determination, selection, or appointment is furnished by the will, and no positive or discretionary power of determination bestowed. * * * Who then are entitled to this bequest? What is meant by indigent young men? No rule of discrimination is given. And who but Him that knoweth the heart can determine who are the pious ones intended by the testator. Surely he

did not intend all who merely make professions of piety. And what was meant by preparing for the ministry in New Haven? Was it a preparation by a course of theological or academical study?"

Every feature of uncertainty pointed out by Chief Justice CHURCH, in the above cited case, exists, with bolder outlines, in the case at bar. It is certainly as difficult to ascertain whether a man is orthodox as whether he is pious. In the first case there exists the double inquiry, what principles are orthodox? and whether a given person professing them does, in fact and at heart, entertain them. Piety is indicated by a man's daily walks in life; his orthodoxy is not. In the Connecticut case, the beneficiaries were in a degree pointed out. They were to be indigent, pious young men preparing for the ministry in New Haven, Connecticut. In the case at bar, the beneficiaries are to be taken from a class numbering millions, and no rule of selection or appointment is prescribed. In the case at bar, the character of the education to be given is not attempted to be described. The case of *White* v. *Fisk* was well considered, and is cited by the later cases involving this question, with approval.

In the case of *Fontain* v. *Ravenel*, 17 How. U. S. 368, the testator in his will had authorized and empowered his executors, or the survivor of them, after the decease of his wife, to dispose of certain portions of his estate, for the use of such charitable institutions in Pennsylvania and South Carolina as they or the survivor of them might deem most beneficial to mankind, and so that part of the colored population in each of said states should partake of the benefits thereof. The executors died without executing the trust. The case was considered as governed by the laws of Pennsylvania, where the principles of the statute of 43 Elizabeth are recognized by the courts. The court held that the clause of the will above recited was too uncertain for judicial administration, and that the executors having died without exercising the discretion conferred upon them by the testator, the property devised lapsed to the next of kin. In this case

the distinctions between English and American law on this subject are clearly drawn.

Justice McLean, in this case, makes use of this language: "There is not only uncertainty in the beneficiaries of this charity, but behind that is a more formidable objection. There is no expressed will of the testator. He intended to speak through his executors, or the successors of them, but by the acts of Providence this has became impossible. It is then as though he had not spoken. Can any power now speak for him, except the *parens patriæ?*"

In the case of *Beekman* v. *Bonsor*, decided by the Court of Appeals, 23 N. Y. 298, the validity of three clauses of the will of one William Barthrop were involved. Although attention is invited to the case, for it is distinguished for research, learning, and an exhaustive discussion of the questions involved, we will here notice only so much of the decision as applies to the clause of the will providing for a dispensary.

This clause reads as follows: "After the expiration of ten years, or sooner, if my executors find that there will be sufficient funds, I would wish a public dispensary, as in New York, on a similar plan, for indigent persons, both sick and lame, to be attended by a physicain elected to the establishment, at their own houses, and also daily at the dispensary; my executors to consult judicious men in Albany, respecting the same, and funds enough to carry on the building and yearly expenses."

The executors, upon the will being probated, renounced the trust and refused to execute the same. The court of appeals in this case held that it would have been competent for the executors, whom the testator had selected to execute his trust and had clothed with discretionary power over omitted details in his scheme of charity, to have carried out the trust, but that they having renounced the trust, the same was so uncertain that it could not be administered by judicial authority. Comstock, J., who delivered the opinion of the court, said: " By that provision the testator declared

that he 'would wish a public dispensary, as in New York, upon a similar plan, for indigent persons, both sick and lame, to be attended by a physician elected to the establishment, at their own houses, and also daily at the establishment; my executors to consult judicious men in Albany respecting the same, and funds enough to carry on the building and yearly expenses.' According to one construction of this clause—a construction certainly plausible—a discretion was reposed in the executors to determine the location of the proposed establishment, its extent and particular characteristics, and the amount of funds to be devoted to the object. The actual exercise of that discretion by those in whom it was confided might, by rendering uncertain certain, relieve the bequest from the objections arising out of its vague and indefinite character. The will of a testator may be ascertained by the acts of those to whom he has entrusted discretion and power. Such acts may be justly regarded as the definite expression of his own purpose. But in this view of the present question, the objections encountered are that the discretion was personal to the individuals appointed to be executors, and that they renounced the trust. * * * If, taking another view of the provision in question, we say that the executors were not appointed to be the authors of a scheme for the proposed dispensary with discretionary powers as to the amount of endowment and other circumstances, we shall find the difficulties still more obvious. All that we can learn from the language of the testator is, that he had in his mind a vague and shadowy conception of a dispensary, similar to those in the city of New York, without any determinate views as to the place of its foundation, the mode of perpetuating and governing it. * * Putting aside, as we do now, the idea of a delegated discretion which might cure these defects, there are wanting all the elements of certainty which are necessary to impart validity to this bequest. There is a fatal uncertainty both as to the subject and the object of the bequest."

The learned judge, after deciding the clause of the will

relating to the dispensary void for uncertainty, enters into an elaborate argument, showing that the English law on this subject is not the law in this country.   As in the case at bar, in the above case the beneficiaries were not designated.   It differs from this case, however, in this, that the scheme or plan by which the charity was to be carried out is in a great degree defined.   A public dispensary was to be erected, on the same plan as similar institutions in the city of New York, at which the sick and the lame were to be attended by a physician elected to the establishment, at their own homes, and also daily at the establishment, yet the court of appeals held the charity to be too indefinite for judicial administration in the absence of trustees with delegated discretion to supply omitted details, such as the selection of a location for the proposed establishment, its extent, and the amount of funds to be devoted to it.   The case was much stronger in favor of the charity than the one under consideration.   We have presented the above cases as illustrations of the degree of the certainty necessary to constitute a valid charity.   We claim that they establish these principles : If the charity does not fix itself upon any particular object, but is general and indefinite, such as the promotion of the moral and intellectual condition of a race, or the relief of the poor, and no plan or scheme is prescribed, and no discretion is lodged by the testator in certain and ascertainable individuals, it does not admit of judicial administration.   In such a case in England the administration of the charity is cast upon the King to be executed *cy pres*, while in this country the property devised lapses to the next of kin.   If, however, in such a case certain and ascertainable trustees are appointed, with full powers to select the beneficiaries and devise a scheme or plan of application of the funds appropriated, the court will, through the trustees, execute the charity.

If a scheme is prescribed, such as the foundation of a school, with clear and specific directions as to its government and the application of the funds appropriated, the charity will be sustained by the court.

If a devise is made to an association, voluntary or corporate, having its board of trustees and organized for a known and legal purpose, such as a church, or a theological institute, the law will presume that the testator intended that the trustees or regents of such association should administer the charity in furtherance of the purpose of such association, and, when necessary, select the beneficaries. See *Bridges v. Pleasants*, 4 Ired. Eq. 26.

In *Lepage* v. *McNamara*, 5 Iowa, 124, it was held, that, "there is, in general, the same necessity for a *cestui que trust*, capable of taking the beneficial interest, and so defined and pointed out as that there shall be no uncertainty, as there is for a properly defined grantee in a deed. *Gallego's Ex'rs.* v. *Attorney General*, 3. Leigh, 450. If there is such uncertainty, as that it cannot be known who is to take as beneficiary, the trust is void; and the heir, by operation of law, will take the legal estate, stripped of the trust."

A devise for the use of the schools among the inhabitants of the north-west parish of Boxford is void for uncertainty. *Barker* v. *Wood*, 9 Mass. 419.

A devise, "I give my farm in Pomfret to the yearly meeting of people called Quakers of New England, the net income to be appropriated in aid of the charitable fund of the boarding school established by Friends in Providence." In an action of ejectment by the heirs at law, it was held, first, that the individuals composing the meeting did not take; second, that the yearly meeting as a voluntary association did not take; third, that they could not take as a corporation unless expressly authorized by their charter; fourth, that the devise could not be sustained as a charity; fifth, that the subject devised descended to the heirs at law. *Greene* v. *Dennis*, 6 Conn. 293.

In *Wheeler* v. *Smith*, 9 How. U. S. 55, it was held, that a bequest to trustees for such purposes as they consider might prove to be most beneficial to the town and trade of Alexandria was void.

In *Kelley* v. *Kelley*, 25 Penn. St. 460, it was held that a will which contains no intelligible devise or bequest is void.

In *Trippe* v. *Frazier*, 4 Har. & Johns. 446, it was held that a bequest to the real distressed poor of Talbot county, Maryland, was void for uncertainty.

In *Wilderman* v. *City of Baltimore*, 8 Md. 551, it was held that a devise to the city of Baltimore, in trust for the relief and support of the indigent poor persons who may from time to time reside in the twelfth ward of said city, was void, as being too vague and indefinite, and the property vests in the next of kin, or residuary legatee; and their rights vesting immediately, it is not competent for the legislature to divest them by a subsequent act.

In *Morse* v. *Carpenter*, 19 Vt. 513, it was held, that a devise to the poor or a deed to the poor of a parish is void for vagueness and uncertainty. The court say: " These, and the like cases, furnish illustrations in reference to the grantee, of the *ambiguitas patens*, strictly so called, an ambiguity not removable by construction, nor to be explained by evidence *aliunde*, without making more, or less, of the instrument than its terms import."

In *Gallego's Ex'rs* v. *Attorney General*, 3 Leigh. 450, it was held, that a devise to executors, to lay by two thousand dollars to be distributed among needy poor and respectable widows was uncertain as to beneficiaries, and void.

A bequest ," I leave the whole of said funds in the hands of my executor, to be applied by him to the support of the missionaries in India, under the direction of the general assembly board of missions of the Presbyterian Church," is void for uncertainty. *Presbyterian Church* v. *White*, Phila. Law Reg. 526.

A devise to the Education Society of Virginia, for the benefit of theological students at the seminary near Alexandria, is void for uncertainty. Opinion of Taney, *supra*.

In *Bridges* v. *Pleasants*, 4 Ired. Eq. 26, it is held, that a bequest for religious charity must be to some definite purpose, or to some body or association of persons, having a legal existence and with capacity to take.

In *Morice* v. *Bishop of Durham,* 9 Ves. 399, 10 Ves. 522, it was held, that a gift to the bishop, "to be disposed of to such objects of benevolence and liberality as he should most approve of," was void for its vagueness and generality, inasmuch as no person or persons in particular could claim the benefit of the gift or enforce the bishop to bestow charity upon any person, while it was yet clear that the bishop could not keep it himself. Therefore, the subjects of such gifts result to the heir or next of kin of the donor.

The reasoning of the court in the case of *Dashiell* v. *Attorney General,* 5 Har. & Johns. 392, is so strongly in point in the case under consideration, that we reproduce the statement of the case and the opinion of the court upon the question of vagueness and uncertainty. The court say: "It is an admitted general principle, that a vague bequest, the object of which is indefinite, cannot be established in a court of equity. Is this a bequest of that description? We think it clearly is. The testator, by his will, appointed the appellant, George Dashiell, and Henry Downes, trustees of his estate, and the guardians of his only child, with instructions to his executors to pay over to them the annual income of his estate, to be by them appropriated according to the provisions of the will, which, after providing, among other things, for the payment of his debts, and the support and education of his daughter, directs the residue of the income of his estate, 'to be equally divided, one half to be applied towards feeding, clothing, and educating the poor children belonging to the congregation of Saint Peter's Protestant Episcopal Church in the city of Baltimore,' &c., with certain provisions for the eventual increase or decrease of the fund so set apart for that purpose. Who are 'the poor children belonging to the congregation of Saint Peter's Protestant Episcopal Church in the city of Baltimore?' No court can know or have the means of ascertaining; and the description of the *cestui que trust* is so vague, that none can be found who, upon the general principles of equity, can entitle themselves to the benefit of the trust."

The court, after reviewing the case of *Morice* v. *Bishop of Durham, supra,* and discussing the doctrine of discretion vested in trustees, says: "But no such power is given; the trustees are directed to appropriate the fund entrusted to them, to the feeding, clothing, and educating the poor children belonging to that congregation, not such as they might select, and without any right or power to discriminate; and there is no difference whether a devise or bequest be immediate to an indefinite object, or to a trustee for the use and benefit of an indefinite object. If it be immediate to an indefinite object, it is void; and if it be a trust for an indefinite object, the property that is the subject of the trust is not disposed of, and the trust results for the benefit of those to whom the law gives the property in the absence of any other disposition of it by the testator or donor."

The principles enunciated in the above case are the same as in *White* v. *Fisk, supra,* and *Beekman* v. *Bonsor, supra,* and many other of the adjudicated cases referred to, and are directly in point in the case under consideration. In the above case the decision was made to turn upon the fact that the bequest was to all the poor belonging to a certain church and that there was no power given to select the beneficaries from the class or discriminate between them. In *Fontain* v. *Ravenel, supra,* and in *Beekman* v. *Bonsor, supra,* the trust was defeated because there was no declared will of the testator, but only a vague and indefinite intention declared or wish expressed. In *White* v. *Fisk* the ruling was based upon the fact that there was "no rule of determination, selection, or appointment furnished by the will, and no positive or discretionary power of determination bestowed."

In the case of *White* v. *Fisk* the beneficiaries were described as the pious young men preparing for the ministry in New Haven. In *M'Cord* v. *Ochiltree* they are described, as pious, indigent youths preparing for the ministry of the gospel according to a peculiar order of faith. In *Dashiell* v. *Attorney General* they are described as "the children belonging to the congregation of Saint Peter's Protestant Epis-

copal Church in the city of Baltimore," while in the case under consideration they are described as "the colored children, both male and female, of the colored race," without any power of determination, selection, discrimination, or appointment, except that the trust is to be executed in "such way and manner as they may deem best, of which a majority shall determine."

In *Dashiell* v. *Attorney General*, it is said that "there is no difference whether a devise or bequest be immediate to an indefinite object, or to a trustee for the use and benefit of an indefinite object."

If the devise or bequest, in the case under consideration, had been made *directly* to the beneficiaries therein named, without the intervention of trustees, would any one maintain that it could be sustained? We presume that every one learned in the law would admit that it would be void for vagueness and uncertainty.

It was held in *White* v. *Fisk* and *Bridges* v. *Pleasants, supra,* that "each one of those falling within the description named has an equitable or beneficial interest in the fund, and which he must have the right to enforce if any can."

Let us apply these principles to the case under consideration. The trust created is in favor of the colored children, both male and female, of the colored race. We have adopted the theory of the learned counsel for the appellants, that the testator intended that his beneficiaries should be selected from the children of the African race residing in the United States. We know historically that there are about four millions of that race within the states and territories of the United States, and that they are scattered over a vast extent of territory, from the lakes in the north to the gulf of Mexico in the south, and from the Atlantic to the Pacific.

If it is true that each one falling within the description named has an equitable or beneficial interest in the fund, and one which he has the right to enforce, does it need any

argument or illustration to demonstrate that it will be impracticable, nay impossible, to execute the trust?

If it is true, as we have tried to demonstrate, that under the will, the trustees have no power or discretion to select the beneficiaries from the class designated, does it not logically and unavoidably result that the devise must be held void for its vaguenes and uncertainty? Viewing the matter in either aspect, it is quite obvious to us that it will be impracticable and impossible to execute the trust.

The cases cited by the counsel for the appellants are, in general, readily distinguishable from the one under consideration. In some of the cases the objects and purposes of the charity were defined, and the mode of its application prescribed with precision. In others, where the purpose of the charity was general, trustees were appointed, who were in existence, ascertainable, and competent to act, with plenary discretion to speak for the testator after his death. In others, the charity was bestowed upon organized associations, voluntary or corporate, having boards of trustees or regents.

The principal case relied upon by the counsel for the appellants is *M'Cord* v. *Ochiltree*, 8 Blackf. 15. That case was this: John Ochiltree died in 1840, testate. By his last will and testament, among other bequest, he made the following: "After paying all the foregoing bequests, I give and bequeath unto the Theological Seminary at South Hanover, in the State of Indiana, all the remainder of my estate, to continue a permanent fund, and the interest to be applied to the education of pious, indigent youths who are preparing themselves for the ministry of the gospel, and those only who strictly adhere to the Westminster confession of faith in its literal meaning."

When the testator made his will, and when he died, the theological seminary referred to was organized and regularly conducted under the management of directors appointed for that purpose. Now, in this bequest there was no uncertainty whatever, except that the beneficiaries were not designated by

name, but were referred to as a class and designated as pious, indigent youths. The intention of the testator is manifest as to who should select the beneficiaries, the kind of education to be given, and the particular seminary at which it should be given. The devise was to a certain theological seminary, then organized and regularly conducted. It was clearly the intention of the testator that the beneficiaries should be selected by the directors of that seminary, should be there educated, and that the education received should be theological, as it was exclusively a theological seminary. We have then here, not only certain and ascertainable persons to select the beneficiaries, but the kind of education is prescribed, and the instrumentality by which the charity should be carried into effect is already pointed out. Judge Dewey, when he penned his opinion, very clearly appreciated the importance of these facts; for he carefully makes these statements: "All the operations of the theological seminary were to be conducted on the principle of a strict adherence to the standard of the Presbyterian church in its obvious meaning. * * From its first establishment at South Hanover, until its incorporation, the seminary was always organized under the management of directors appointed for that purpose." This forms the distinguishing feature between the case of *M'Cord* v. *Ochiltree* and *White* v. *Fisk.* In other respects the cases are parallel.

Chief Justice Church, when he delivered the decision in *White* v. *Fisk,* appreciated the importance of this difference between the two cases, as appears from the following passages in that decison: "This legacy is not given to any college or institution, nor to any association of persons corporate or voluntary, nor is any such alluded to, by which the charity can be dispensed. * * * If a bequest for the purpose indicated in this will, in this respect, had been made to a college, a theological institute, the congregational society of which the testator was a member, or other body which had, or might have, a supervision or interest in the general welfare of this charity, and rules for its management, it

would have presented a very different case.   *   *   *
There is a class of cases, the authority of which we recog-
nize, where the individual beneficiaries under a will, but in-
cluded in a definite class, are left uncertain, and yet the be-
quest for their benefit has been sustained. But these are
cases where the gift has been to some corporate or voluntary
association, whose duty and business it becomes to dispense
the charity."

The force of this distinction is acknowledged by DEWEY,
J., in *Bartlet* v. *King*, 12 Mass. 537.  He says: "The second
point made by the defendant's counsel is, that the bequest is
void for uncertainty.   *   *   It is manifest that the legacy is
not given to the plaintiffs, but in trust for the use of others;
and it is said on the part of the defendant, that the trust, or
the persons who are entitled to the benefit of it, as *cestui
que trust*, are altogether uncertain.  If this be so, the bequest
is undoubtedly void.   *   *   It then becomes necessary to
inquire, who are the persons to whose use the plaintiffs claim
the legacy under the will of the testatrix?  They are not
described by their proper names, nor by the name of any
corporate body; but they are called 'The American Board of
Commissioners for Foreign Missions and their associates.'

"The persons who at the time of executing the will con-
stituted the board and their associates, if they can be ascer-
tained, are the persons for whose use the legacy was inten-
ded; not for their personal and individual benefit, but as trus-
tees to apply the proceeds of it to the purposes of the board,
and to promote the pious objects for which it was established.
It is not necessary that a legatee be named.  If he is other-
wise clearly described, it is sufficient.   *   *   *   If the per-
sons who constitute the American Board of Foreign Mis-
sions are certain and known by that description, we then
have as much certainty with regard to the persons to whom
the plaintiffs are to pay over the interest and income of the
legacy as if they had been expressly named in the will.  For
this we must recur to the facts agreed by the parties; and
by them it is admitted that such a board was in existence,

consisting of nine persons, and known to the testratrix at the time of executing her will."

Now, it will be observed that this case turned upon the ground that the persons composing the American Board of Foreign Missions were ascertainable, and that therefore the case fell within the maxim, *id certum est, quod certum reddi potest.* It is expressly stated that had they not been ascertainable persons the charity would have failed.

In that case the existence of the association was admitted, and that the persons composing it were known to the testator. In the case under consideration the complaint avers, and the demurrer admits, that no such association as the "orthodox protestant clergymen of Delphi" ever did exist.

In that case the beneficiaries are so described that it was as easy to ascertain who were intended as though they had been expressly named, while in this case the beneficiaries are designated only as a class of persons belonging to four millions of their race in this country.

We, therefore, hold that the residuary devise and bequest is void at law, and cannot receive a judicial enforcement by a court of chancery possessing the ordinary powers of a court of equity.

It is claimed by the appellants, that while the bequest under consideration may be void at law, on the ground of uncertainty as to the recipients of the charity and the want of trustees to execute the trust, it will be sustained in equity. It is admitted by the appellees that the bequest under consideration would be sustained and executed in England. It is claimed by the appellants that the courts of chancery in this State possess all the powers of the court of chancery in England. It is maintained by the appellees that the courts of chancery in this State possess none but judicial power, that they posses no prerogative power, such as the Chancellor of England does, and which is derived from the King; that the *cy pres* power is not judicial, but a royal prerogative, exercised under the sign-manual of the King. It is also maintained by the appellants that the statute of 43 Eliza-

beth created new rights and conferred new powers on the courts of chancery; while it is contended by the appellees that such statute created no new rights, but provided new and different remedies.

The solution of these various controverted points depends upon five propositions: First, are the powers possessed by the court of chancery in England, in reference to charitable uses, exercised in virtue of the prerogative power, and not as a part of the jurisdiction inherent in a court acting as a court of equity? Second, was this prerogative derived directly from the King under his sign-manual, or was it conferred on the court by the statute of 43 Elizabeth, known as the statute of charitable uses? Third, is the *cy pres* a judicial or prerogative power? Fourth, do the courts of chancery in this State possess any prerogative power? Fifth, in what manner, and to what extent, can the courts of chancery in this State execute the statute of 43 Elizabeth?

We will discuss these propositions in the order stated. TANEY, Ch. J., in *Fontain* v. *Ravenel* 17 How. U. S. 369, says: "But the power which the chancellor exercises over donations to charitable uses, so far as it differs from the power he exercises in other cases of trust, does not belong to the court of chancery as a court of equity, nor is it a part of its judicial power and jurisdiction. It is a branch of the prerogative power of the King as *parens patriæ*, which he exercises by the chancellor."

This great and learned judge in the same opinion says: "Resting my opinion upon the English authorities above referred to, and upon the emphatic language just quoted from the decision of this court, I think I may safely conclude that the power exercised by the English court of chancery in enforcing donations to charitable uses, which would not be valid if made to other uses, is not a part of its jurisdiction as a court of equity, but a prerogative power exercised by that court." See, to the same effect, *The Baptist Association* v. *Hart's Ex'rs*, 4 Wheat. 1; 3 Bl. Com. 49; *Vidal* v. *Girard's Ex'rs*, 2 How. U. S. 127; *M' Cord* v. *Ochiltree*, 8 Blackf. 15.

There has been much discussion and diversity of opinion as to the second proposition. TANEY, C. J., in *Fontain* v. *Ravenel, supra,* says: "In the cases in relation to charities which have come before this court, there has been a good deal of discussion upon the question, whether the power of the chancery court of England was derived from 43 Elizabeth, or was exercised by the court before that act was passed. And there has been a diversity of opinion upon the subject in England, as well as in this country. In the case of the *Baptist Association* v. *Hart's Ex'rs,* Chief Justice MARSHALL, who delivered the opinion of the court (see 4 Wheat. 49), and Mr. Justice STORY, who wrote out his own opinion. and afterwards published it in the appendix to 3 Pet. Rep. 497, were both at that time of opinion that it was derived from the statute. But in *Vidal* v. *Girard's Ex'rs,* 2 How. U. S. 127, Mr. Justice STORY changed his opinion, chiefly upon authority of cases found in the old English record which had been printed a short time before by the commissioners on public records in England. It appeared from these records that the power had been exercised in many cases long before the statute was passed."

In case of the *Baptist Association* v. *Hart's Ex'rs,* 4 Wheat. 1, MARSHALL, C. J., says: "We now find this prerogative employed in enforcing donations to charitable uses, which would not be valid if made to other uses, in applying them to different objects than those designated by the donor, and in supplying all defects in the instrument by which the donation is conveyed, or in that by which it is administered."

In *Vidal* v. *Girard's Ex'rs, supra,* Mr. Justice STORY, in speaking for the court says: "But what is still more important, is the declation of Lord REDESDALE, a great judge in equity, in the *Attorney General* v. *Mayor of Dublin,* 1 Bligh R. 312, 347, (1827) where he says, 'We are referred to the statute of Elizabeth with respect to charitable uses, as creating a new law upon the subject of charitable uses. That statute only created a new jurisdiction, it created no new law. It created a new and ancillary jurisdiction, a jurisdic-

tion created by commission, &c., but the proceedings of that commission were made subject to appeal to the lord chancellor, and he might reverse or affirm what they had done, or make such order as he might think fit for reserving the controlling jurisdiction of the court of chancery as it existed before the passing of that statute; and there can be no doubt that by information by the Attorney General the same thing might be done.' He then adds, 'the right which the Attorney General has to file an information is a right of prerogative. The King, as *parens patriæ,* has a right, by his proper officer, to call upon the several courts of justice, according to the nature of their several jurisdictions, to see that right is done to his subjects who are incompetent to act for themselves, as in cases of charities and other cases.'" Mr. Justice Story after referring to many cases that were decided before the passage of the act in question, says, "Whatever doubts, therefore, might properly be entertained upon the subject when the case of the *Trustees of the Philadelphia Baptist Association* v. *Hart's Ex'rs,* 4 Wheat. 1, was before this court, (1819) those doubts are entirely removed by the late and more satisfactory sources of information to which we have alluded."

Dewey, J., in *M'Cord* v. *Ochiltree, supra,* says, "The jurisdiction of the English court of chancery has several branches, and is derived from various sources. The most important branch of its power is that general one which it exercises as a court of equity, in common with the court of exchequer; but besides this extensive equity jurisdiction it has other powers which are peculiar to itself. Of these powers it will be necessary, on the present occasion, to notice but one, that which is delegated to it by the crown as *parens patriæ.* Within this branch of its jurisdiction is classed the superintendence of infants, idiots, lunatics and certain charities."

There are many other authorities to the same effect, but we do not deem it necessary to refer to them, as those produced fully demonstrate that the power under discussion

was a prerogative power, and was not conferred by the statute of 43 Elizabeth.

It is so well settled by adjudicated cases, both in England and in this country, that the *cy pres* power as possessed and exercised by the courts of chancery in England was derived directly from the king and constituted a part of the prerogative power, that it is not deemed necessary to refer to authorities.

The fourth proposition is, do the courts of chancery, as constituted and existing in the State of Indiana, possess and can they exercise the prerogative power that is possessed and exercised by the court of chancery in England?

By our State constitution, the judicial power of the State is vested in a Supreme Court, in circuit courts, and such inferior courts as the General Assembly may establish. Sec. 1, article 7.

The constitution of the United States provides, that, "the judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time order and establish." Sec. 1, article 3.

Mr. Chief Justice TANEY, in *Fontain* v. *Ravenel, supra,* says: "The constitution of the United States, as I have before said, grants only judicial power at law and in equity to its courts; that is, the powers at that time understood and exercised as judicial, in the courts of common law and equity in England. And it must be construed according to the meaning which the words used conveyed at the time of its adoption; and the grant of power cannot be enlarged by resorting to a jurisdiction which the court of chancery in England, centuries ago, may have claimed as a part of its ordinary judicial power, but which had been abandoned and repudiated as untenable on that ground, by the court itself, long before the constitution was adopted."

Mr. Justice McLEAN, in speaking for the court, in *Fontain* v. *Ravenel, supra,* says: "The courts of the United States cannot exercise any equity powers, except those conferred by acts of Congress, and those judicial powers which

the high court of chancery in England, acting under its judicial capacity as a court of equity, possessed and exercised at the time of the formation of the constitution of the United States. Powers not judicial, exercised by the chancellor merely as the representative of the sovereign, and by virtue of the king's prerogative as *parens patriæ*, are not possessed by the circuit courts."

Mr. Willard, in his Equity Jurisprudence, says: "The reason is that we have no magistrate clothed with the prerogatives of the crown, and our courts of justice are entrusted only with judicial authority."

In the case of *Moore's Heirs* v. *Moore's Devisees and Executors*, 4 Dana, 354, Mr. Chief Justice ROBERTSON, speaking for the court, says: "And we do not admit that the commonwealth as *parens patriæ* can rightfully interfere unless there be an escheat to her; and then she may become the absolute and beneficial owner. Rights here are regulated by law; and if any person have a claim to property ineffectually dedicated to charity, the commonwealth has no prerogative right to decide on that claim and dispose of the property as the King of England has been permitted to do."

In *Williams* v. *Williams*, 4 Seld. 525, DENIO, J., said: "I concede the English doctrine is in force here only so far as it is adapted to our political condition. In that class of cases, therefore, where the gift is so indefinite that it cannot be executed by the court, * * * * the claim of the representatives of the donor must prevail over the charity. The reason is, we have no magistrate clothed with the prerogatives of the crown, and our courts of justice are entrusted only with judicial power."

In *Beekman* v. *Bonsor*, 23 N. Y. 298, COMSTOCK, C. J., says: "The *cy pres* power which constitutes the peculiar feature of the English system, and is exerted in determining gifts to charity, where the donor has failed to define them, and in preparing schemes of approximation near to or remote from the donor's true design, is unsuited to our institutions,

and has no existence in the jurisprudence in this State on this subject."

The Court of Errors and Appeal, in the State of New Jersey, in *Thomson's Ex'rs* v. *Norris*, 5 C. E. Green, 489, say: " Is the purpose indicated, then, a charity in a legal point of view? I do not understand that there is any difference whatever between the common law of England and of this State upon the point as to what constitutes the legal definition of a charity. And by this common law I mean that system, so far as respects this question, which has grown up in a series of decisions founded, in part, upon the 43d of Elizabeth, ch. 4 (the statute of charitable uses). The doctrine of the English court of chancery with regard to the mere classification of things which are, and those which are not charities, in the eyes of the law, has been very generally recognized in this country. The discrepancy between the English and American systems regulating charities consists in this, that in England a bequest for a charity will be effectuated, no matter how uncertain the objects or the persons may be, or whether the bequest can be carried into exact execution or not; for when a literal execution becomes impracticable, the court will administer it on the doctrine of *cy pres*. In some instances the courts of this country have refused to exercise so extensive a jurisdiction. I am not aware that in our own courts this subject has received any elucidation. It may well be, therefore, that a bequest, obviously for a charity, and which in England would be carried into effect, might not be enforced in our own courts, on the ground of the indefiniteness of its objects or the impracticability of its execution. But this is a diversity of legal administration, and not of legal classification. Upon the questions what is, or what is not, a charitable use, we have no criterion but the rules of the common law, and those rules, consequently, are obligatory upon us."

The Supreme Court of Iowa, in the case of *Lepage* v. *McNamara*, 5 Iowa, 124, say: " It will hardly be profitable to institute an inquiry into the analogy between the present

case and those in which the chancellor in England, by the application of the civil law doctrine of *cy pres*, gives effect to gifts and devises, where only a general purpose of charity is manifested; or where either the prescribed object, or the mode of applying it, has failed or become impracticable; or another class of cases, where no particular object is designated, and no trustee named, or person appointed, to select the object, and which are administered by the chancellor under the prerogative power, and by virtue of an appointment of the Crown, as *parens patriæ*. In either class of cases, unless the donor manifest an intention to restrict his bounty to some general object of charity, embraced by the statute of 43 Elizabeth, chap. 4, the legacy or gift will be void, and neither the King nor the chancellor can make any application of it. *Moggridge* v. *Thackwell*, 7 Vesey, 75.

"Our courts of chancery have no other than judicial power, and consequently have no jurisdiction in the second class of cases above enumerated. The state cannot interfere as *parens patriæ*. If a testator ineffectually dedicates his property to charity, or in such a manner that the devise is void, the state has no prerogative right to interfere and dispose of the property, as the King of England has been permitted to do. *Attorney Gen.* v. *Utica Ins. Co.* 2 Johns. Ch. 386–7; *Moore's Heirs* v. *Moore's Devisees*, 4 Dana, 366. Even in England, it has been held that the chancellor, as a judge in equity, could not enforce a charitable trust, if, according to the rules of the common law, it was either illegal or void for indefiniteness or vague generality. Nor could he, as such, apply the charity to any other purpose than that designated by the donor. He must be governed by the principles of the common law respecting trusts, adopted from the civil law. Neither the Crown, nor the chancellor under his delegated authority, could enforce or appropriate a charitable legacy or gift which was not valid. Prerogative itself could not violate the private legal rights of those who, by operation of law, were entitled to property which had been

illegally dedicated to charity. See *Baptist Association* v; *Hart's Executors*, 4 Wheat. 1; *Moore's Heirs* v. *Moore's Devisees, supra.* In the case last cited, ROBERTSON, C. J., delivering the opinion of the Court, says: 'We are satisfied that the *cy pres* doctrine of England, is not, or should not be, a judicial doctrine, except in one kind of case; and that is, when there is an available charity to an identified or ascertainable object, and a particular mode, inadequate, illegal, or inappropriate, or which happens to fail, has been prescribed. In such cases, a court of equity may substitute or sanction any other mode that may be lawful and suitable, and will effectuate the declared intention of the donor, and not arbitrarily and in the dark, presuming on his motives or wishes, declare an object for him.' "

The last proposition is, in what manner, and to what extent, the courts of this State execute the statute of 43 Elizabeth. The General Assembly, on the 31st of May, 1852, passed an act entitled, "An act declaring the law governing this State," which reads as follows:

"SEC. 1. Be it enacted by the General Assembly of the State of Indiana, that the law governing this State is declared to be: First. The Constitution of the United States and of this State. Second. All statutes of the General Assembly of this State, in force, and not inconsistent with such constitutions. Third. All statutes of the United States, in force, and relating to subjects over which Congress has power to legislate for the States, and not inconsistent with the Constitution of the United States. Fourth. The common law of England, and statutes of the British Parliament made in aid thereof, prior to the fourth year of the reign of James the First (except the second section of the sixth chapter of forty-third Elizabeth, the eighth chapter of thirteenth Elizabeth, and the ninth chapter of thirty-seventh Henry the Eighth), and which are of a general nature, *not local* to that kingdom, and not inconsistent with the first, second, and third specifications of this section."

The forty-third chapter of Elizabeth, commonly known as

the Statute of Charitable Uses, is in the words and figures as follows, namely:

"An act to redress the misemployment of lands, goods, and stocks of money, heretofore given to certain charitable uses.

"Whereas lands, tenements, rents, annuities, profits, hereditaments, goods, chattels, money and stocks of money, have been heretofore given, limited, appointed and assigned, as well by the Queen's most excellent majesty, and her most noble progenitors, as by sundry other well disposed persons; some for relief of aged, impotent and poor people, some for maintenance of sick and maimed soldiers and mariners, schools of learning, free schools, and scholars in universities, some for repair of bridges, ports, havens, causeways, churches, sea banks and highways, some for education and preferment of orphans, some for or towards relief, stock or maintenance for houses of correction, some for marriages of poor maids, some for supportation, aid and help of young tradesmen, handicraftsmen and persons decayed, and others for relief or redemption of prisoners or captives, and for aid and ease of any poor inhabitants, concerning payments of fifteens, setting out of soldiers, and other taxes; which lands, tenements, rents, annuities, profits, hereditaments, goods, chattels, money and stocks of money, nevertheless have not been employed according to the charitable intent of the givers and founders thereof, by reason of frauds, breaches of trust, and negligence in those that should pay, deliver and employ the same: (2) for redress and remedy whereof, be it enacted by authority of this present parliament, That it shall and may be lawful to and for the lord chancellor or keeper of the great seal of England for the time being, and for the chancellor of the duchy of Lancaster for the time being for lands within the county palatine of Lancaster, from time to time to award commissions under the great seal of England, or the seal of the county palatine, as the case shall require, into all or any part or parts of this realm respectively, according to their several jurisdictions as aforesaid, to the bishop of every several

diocese and his chancellor (in case there shall be any bishop
of that diocese at the time of awarding of the same commis-
sions), and to other persons of good and sound behavior,
(3) authorizing them thereby, or any four or more of them,
to enquire, as well by the oaths of twelve lawful men or
more of the county, as by all other good and lawful ways,
and means, of all and singular such gifts, limitations, assign-
ments and appointments aforesaid, and of the abuses, breaches
of trusts, negligences, misemployments, not employing, con-
cealing, defrauding, misconverting or misgovernment of any
lands, tenements, rents, annuities, profits, hereditaments,
goods, chattels, money or stocks of money, heretofore given,
limited, appointed, or assigned, and which hereafter shall be
given, limited, appointed or assigned, to or for any of the chari-
table and godly uses before rehearsed; (4) and after the said
commissioners or any four or more of them (upon calling the
parties interested in such lands, tenements, rents, annuities,
profits, hereditaments, goods, chattels, money and stocks of
money) shall make enquiry by the oaths of twelve men or
more of the said county (whereunto the said parties interested
shall and may have and take their lawful challenge and
challenges), (5) and upon such inquiry, hearing and examin-
ing thereof, set down such orders, judgments and decrees, as
the said lands, tenements, rents, annuities, profits, goods,
chattels, money and stocks of money, may be duly and faith-
fully employed, to and for such of the charitable uses and
intents before rehearsed respectively, for which they were
given, limited, assigned or appointed by the donors and
founders thereof: (6) which orders, judgments and decrees,
not being contrary or repugnant to the orders, statutes or
decrees of the donors or founders, shall by the authority of
this present parliament stand firm and good, according to the
tenor and purport thereof, and shall be executed accordingly,
until the same shall be undone or altered by the lord chan-
cellor of England, or lord keeper of the great seal of England,
or the chancellor of the county palatine of Lancaster, respect-

ively, within their several jurisdictions, upon complaint by any party grieved to be made to them.

" II. Provided always, That neither this act, nor any thing therein contained, shall in any wise extend to any lands, tenements, rents, annuities, profits, goods, chattels, money or stocks of money, given, limited, appointed, or assigned, or which shall be given, limited, appointed or assigned to any college, hall or house of learning within the limits of Oxford or Cambridge, or to the colleges of Westminster, Eaton or Winchester, or any of them, or to any cathedral or collegiate church within this realm.

" III. And provided also, That neither this act, nor any thing therein, shall extend to any city, town corporate, or to any the lands or tenements given to the uses aforesaid within any such city or town corporate, where there is a special governor or governors appointed to govern or direct such lands, tenements, or things disposed to any the uses aforesaid, neither to any college, hospital or free school, which have special visitors or governors, or overseers appointed them by their founders.

" IV. Provided also, and be it enacted by the authority aforesaid, That neither this act, nor any thing therein contained, shall be any way prejudicial or hurtful to the jurisdiction or power of the ordinary, but that he may lawfully in every cause execute and perform the same, as though this act had never been had or made.

" V. Provided also, and be it enacted, That no person or persons that hath or shall have any of the said lands, tenements, rents, annuities, profits, hereditaments, goods, chattels, money or stocks of money in his hands or possession, or doth or shall pretend title thereunto, shall be named a commissioner or a juror for any of the causes aforesaid, or being named, shall execute or serve in the same.

" VI. And provided also, That no person or persons which hath purchased or obtained, or shall purchase or obtain, upon valuable consideration of money or land, any estate or interest of, in, to or out of any lands, tenements, rents, annuities,

hereditaments, goods or chattels, that have been or shall be given, limited or appointed to any of the charitable uses above mentioned, without fraud or covin, having no notice of the same charitable use, shall not be impeached by any decrees or orders of the commissioners above mentioned, for or concerning the same, his estate or interest: (2) and yet, nevertheless, be it enacted, That the said commissioners, or any four or more of them, shall and may make decrees and orders for recompense to be made by any person or persons, who, being put in trust, or having notice of the charitable uses above mentioned, hath or shall break the same trust, or defraud the same uses, by any conveyance, gift, grant, lease, demise, release or conversion whatsoever, and against the heirs, executors and administrators of him, them, or any of them, having assets in law or equity, so far as the same assets will extend.

"VII. Provided always, That this act shall not extend to give power or authority to any commissioners before mentioned, to make any orders, judgments or decrees for or concerning any manors, lands, tenements or other hereditaments assured, conveyed. granted or come unto the Queen's majesty, to the late King Henry the Eighth, King Edward the Sixth, or Queen Mary, by act of parliament, surrender, exchange, relinquishment, escheat, attainder, conveyance or otherwise: (2) and yet, nevertheless, be it enacted, That if any such manors, lands, tenements or hereditaments or any of them, or any estate, rent or profit thereof, or out of the same or any part thereof, have or hath been given, granted, limited, appointed or assigned to or for any the charitable uses before expressed, at any time since the beginning of her majesty's reign; That then the said commissioners, or any four or more of them, shall and may, as concerning the same lands, tenements, hereditaments, estate, rent or profit so given, limited, appointed or assigned, proceed to enquire, and to make orders, judgments and decrees, according to the

purport and meaning of this act, as before is mentioned, the said last mentioned proviso notwithstanding.

"VIII. And be it further enacted, That all orders, judgments and decrees of the said commissioners, or any four or more of them, shall be certified under the seals of the said commissioners, or any four or more of them, either into the court of the chancery of England, or into the court of the chancery within the county palatine of Lancaster, as the case shall require respectively, according to their several jurisdictions, within such convenient time as shall be limited in the said commissions.

"IX. And that the said lord chanceller or lord keeper, and the said chancellor of the duchy, shall and may, within their said several jurisdictions, take such order for the due execution of all or any of the said judgments, decrees and orders, as to either of them shall seem fit and convenient.

"X. And that if after any such certificate or certificates made, any person or persons shall find themselves grieved with any of the said orders, judgments or decrees, that then it shall and may be lawful to and for them and any of them, to complain in that behalf unto the said lord chancellor or lord keeper, or to the chancellor of the said duchy of Lancaster, according to their several jurisdictions, for redress therein; (2) and that upon such complaint, the said lord chancellor or lord keeper, or the said chancellor of the duchy, may according to their several jurisdictions, by such course as to their wisdom shall seem meetest, the circumstances of the case considered, proceed to the examination, hearing and determining thereof; (3) and upon hearing thereof, shall and may annul, diminish, alter or enlarge the said orders, judgments and decrees of the said commissioners, or any four or more of them, as either of them in their said several jurisdictions shall be thought to stand with equity and good conscience, according to the true intent and meaning of the donors and founders thereof; (4) and shall and may tax and award good costs of suit by their directions, against such persons as they shall find to complain unto them without just and

sufficient cause of the orders, judgments and decrees before mentioned." Statutes at Large from 1597 to 1660, p. 43 ; Coke's Second Institute, vols. 3 and 4, 705.

Before a statute of the British Parliament can be in force and constitute a part of the law of this State, under the fourth clause of the above recited act, it must appear that the statute was of a general nature, and not local to the kingdom of Great Britain. If a statute of the British Parliament lacks either of these qualities, it will not constitute a part of the laws of this State. The two things must exist in each statute. If a statute is of a general nature, but is local to that kingdom, it is not in force here.

There can be no doubt that the statute of 43 Elizabeth is of a general nature. The difficult and troublesome question remaining for decision is, whether it is local to that kingdom. It will be observed that the first part of section one declares that twenty-one objects shall be objects of charity ; and that lands, tenements, rents, annuities, profits, hereditaments, goods, chattels, money, and stocks of money, have not been employed according to the charitable intent of the givers and founders thereof, by reason of frauds, breaches of trust, and negligence in those who should pay, deliver and employ the same.

The section proceeds: "For redress and remedy whereof, be it enacted by authority of this present parliament, that it shall and may be lawful to and for the lord chancellor or keeper of the great seal of England for the time being, and for the chancellor of the duchy of Lancaster for the time being, for lands within the county palatine of Lancaster, from time to time, to award commissions under the great seal of England, or the seal of the county palatine, as the case shall require, into all or any part or parts of this realm, respectively, according to their several jurisdictions, as aforesaid, to the bishop of every several diocese and his chancellor (in case there shall be any bishop of that diocese at the time of awarding of the same commissions), and to other

persons of good and sound behaviour, authorizing them thereby, or any four or more of them, to inquire, as well by the oaths of twelve lawful men or more of the county, as by all other good and lawful ways and means of all and singular such gifts, limitations, assignments, and appointments aforesaid, and of the abuses, breaches of trust, negligences, misemployments, not employing, concealing, defrauding, misconverting or misgoverment of any lands, tenements, rents, annuities, profits, hereditaments, goods, chattels, money, and stocks of money, heretofore given, limited, appointed, or assigned, or which shall hereafter be given, limited, appointed, or assigned to or for any the charitable and godly uses before rehearsed."

The section then directs and empowers the said commission to make such orders, judgments and decrees in reference to such lands, &c., as will faithfully employ such lands, &c., to and for such charitable uses and intents as before rehearsed, for which they were given, limited, assigned, or appointed by the donors and founders thereof. These orders, judgments and decrees had to be submitted to the lord chancellor for his approval, who had the power to affirm, set aside, or reverse, in whole or in part.

It is quite plain and manifest to us that all the machincry provided for this new remedy was local to the kingdom of Great Britian, and is wholly unsuited and inapplicable to the condition of things in this country and State. We have no lord chancellor or keeper of the great seal and of the king's conscience. We have no bishop or any other churchman who by virtue of his sacred office sustains any official relation to the government, or is charged with any duty in the administration of justice, as they have in England. The General Assembly of this State has not provided any means, or machinery, as substitutes for the lord chancellor and bishops. It is quite certain that the courts of this State possess no power to appoint such a commission; that if appointed it would have no power to render any order, judgment, or decree; and if such were rendered, they would be absolutely null and void. If this be true, the

courts of this State cannot give a practical and effective enforcement of the remedy provided in the statute under consideration.

In *Owens* v. *The Missionary Society of the M. E. Church*, 14 N. Y. 380, SELDEN, J., says: "This is precisely the class of trusts, as already shown, which gave rise both to informations in chancery in the name of the attorney general, and to the statute of 43 Elizabeth. The remedy afforded by statute has no application in this State; but the remedy by information, so far as it was a common law remedy, is as available here as in England, although it must undoubtedly be modified so as to conform to our different mode of proceeding."

But it is maintained by the appellants that the statute in question created new law, gave new rights, and made new objects of charity. If this position is correct, the statute having been made a part of the law of this State, the courts of this State would possess the power and jurisdiction to enforce those new principles of law and new rights, as they would be of a general nature and not local to the kingdom of Great Britain.

It, therefore, becomes important for us to inquire and determine whether the statute did create new law, confer new rights, and create new objects of charity.

It has been, upon mature consideration, decided by the Supreme Court of the United States, and by the most of the Supreme Courts of the states, that this statute created no new law or new objects of charity, but only provided a new remedy for existing rights. These decisions are fully sustained by the most eminent law writers in this country.

Chancellor KENT says: "It would appear from the preamble of the statute of Elizabeth, that it did not intend to give any new vitality to charitable donations, but rather to provide a new and more effectual remedy for the breaches of those trusts." 2 Kent (11th ed.), 339; *Wilman* v. *Lex*, 17 S. & R. 88; *The Mayor, &c., of Philadelphia* v. *Elliott*, 3 Rawle, 170; *McCartee* v. *The Orphan Asylum Soc.*, 9 Cow. 437;

*Moore's Heirs* v. *Moore's Devisees,* 4 Dana, 354; *The Ref. Prot. Dutch Church* v. *Mott,* 7 Paige, 77; *Ex'rs. of Burr* v. *Smith,* 7 Vt. 241; *Sanderson* v. *White,* 18 Pick. 328; *Wright* v. *Trustees of M. E. Church,* Hoff. 202; *First Bap. Chuch* v. *Witherell,* 3 Paige, 296; *Burbank* v. *Whitney,* 24 Pick. 146.

DEWEY, J., in *M'Cord* v. *Ochiltree, supra,* says: "The statute in question we conceive to be in aid of the common law; for though it gave no new jurisdiction to the court of chancery, it enumerated and specified subjects of its cognizance which, prior to its passage, seem to have been involved somewhat in doubt and obscurity."

Such is now the settled law in England. Judge STORY, in delivering the opinion of the court in *Vidal* v. *Girard's Ex'rs, supra,* said that Lord REDESDALE was a great judge in equity, and all the legal profession know that this high compliment was eminently deserved.

In *Attorney General* v. *The Mayor, &c., of Dublin,* 1 Bligh N. S, 312, Lord REDESDALE, in delivering the opinion of the House of Lords, said: "We are referred to the statute of Elizabeth, with respect to charitable uses, as creating a new law upon the subject of charitable uses. That statute only created a new jurisdiction; it created no new law; it created a new and ancillary jurisdiction, a jurisdiction borrowed from the elements which I have mentioned, a jurisdiction created by a commission to be issued out of the court of chancery to enquire whether the funds given for charitable purposes had or had not been misapplied, and to see to their proper application; but the proceedings of that commission were made subject to appeal to the lord chancellor, and he might reverse or affirm what they had done, or make such order as he might think fit for reserving the controlling jurisdiction of the court of chancery, as it existed before the passing of that statute; and there can be no doubt that, by information by the Attorney General, the same thing might be done. While proceedings under that statute were in common practice (as appears in that collection which is called Duke's Charitable Uses), you will find it stated, that in certain ca-

ses, although a commission might issue under the statute, an information by the attorney general was the better remedy. In process of time, indeed, it was found that the commission of charitable uses was not the best remedy, and that it was better to resort again to the proceedings by way of information in the name of the attorney general. The right which the attorney general has to file an information is a right of prerogative; the king, as *parens patriæ*, has a right, by his proper officer, to call upon the several courts of justice, according to the nature of their several jurisdictions, to see that right is done to his subjects who are incompetent to act for themselves, as in the case of charities and other cases; in the case of lunatics, where he has also a special prerogative to take care of the property of lunatics; and where he may grant the custody to a person who, as a committee, may proceed on behalf of the lunatic; or where there is no such grant, the attorney general may proceed by his information." See the authorities on this point heretofore referred to.

It may be regarded as settled by the modern adjudged cases in England and in this country, that the statute of 43 Elizabeth created no new law or new rights, but only created a new jurisdiction, a new remedy by commission; and that the new remedy has no application to this State and can not be enforced by our courts.

Inasmuch as the courts of this State possess no prerogative power and cannot resort to or enforce the remedy provided by the statute of Elizabeth, it necessarily and unavoidably results that they only possess and can exercise judicial functions, such as are possessed and exercised by the court of chancery in England acting as a court of equity.

The American doctrine in relation to charities does not adopt the English doctrine of *cy pres*, only in a modified and very restricted form. It stops where prerogative under the English system begins. It is strictly judicial. It never interposes to hold up, to sustain. It never takes hold of the property, only to apply it when the object is clear, and where the property has been disposed of in the very act that consti-

tutes the charity. Our courts have never permitted the doctrine to go so far as to act in the capacity of *parens patriæ*. They have never taken jurisdiction merely because the donor intended to dispose of a charity, and exercised that jurisdiction merely *in rem;* and perhaps the real distinction between the English and the American doctrine can be stated in that way. The American courts limit their jurisdiction to matters purely *in personam.* When the persons or parties are uncertain, vague, or not in existence, or incapable of holding or taking, they say that the property has never been disposed of, and remains in the donor or his heirs. Thus they require parties or objects to be pointed out, with reasonable clearness, and to be in existence, or capable of being brought into existence by trustees; and they exercise jurisdiction merely in aid of existing parties and objects, or in creating the subject-matter of the charity through the trustees. Their action is *in personam.*

The English court of chancery, finding property dedicated to some charitable use, operates upon the property, and can hold on to it, and retain it, seeking the object described, or an approximate object; and if it finds that the object intended is not in existence, or cannot hold, it still retains the property, and disposes of it for some charitable purpose. It operates upon the *rem.* The American courts confine their doctrine to the execution of a grant or gift that was complete, and perfect, and capable of execution at the moment of its creation. They hold the *rem* only to execute the intention where that intention is complete and capable of execution by the very terms of the grant or trust.

The abuses and dangers of the English system are presented with great force and clearness by Judge Selden, in delivering the opinion of the court in the case of *Owens* v. *The Missionary Society of the M. E. Church*, 14 N. Y. 380, where he says: "There is little in the history of charitable uses in England to encourage the courts of this country in violating the ordinary rules of law in their efforts to sustain a particu-

lar class of trusts. All partial legislation and strained judicial construction in favor of particular interests tend to disturb that social equality which general and uniform laws, operating in connection with the natural impulses of men, are calculated to produce. Thus, the law of charitable uses in England found its appropriate *finale* in the statute of 9 George 2, ch. 36, which cut off all such uses, if charged in any way upon lands, unless created by deed twelve months before the death of the donor. The statute of Geo. II. enacted to remedy an increasing public mischief arising from improvident alienations or disposition to uses called charitable uses is not in force here, though such legislation might well be expected should we feel called upon to enforce the original statute. Under that amendment the residuary devise and bequest in this case would be void, because the testator was in a languishing, if not dying condition when the will was made, and died within three days thereafter. We do not feel called upon to enforce the original statute by a strained construction of the power and jurisdiction of our courts, where that statute has been so materially amended and the amendment is not in force here. Our courts could only execute the original statute, if it could be executed at all, while in England many of the abuses that had grown up under that statute have been remedied.

We lay down the following principles of law as applicable to the case under consideration, and which are clearly deducible from the foregoing authorities.

1. The jurisdiction of the English Court of Chancery has several branches, and is derived from various sources. The most important branch of its power is that general one which it exercises, under and in virtue of its judicial capacity, as a court of equity, in common with the court of exchequer; but besides this extensive equity jurisdiction, it has other powers which are peculiar to itself. Of these powers, the most important and extensive are the prerogative powers, which are not judicial, but are exercised by the lord chancellor merely as the representative of the sovereign, and by virtue of the King's

prerogative as *parens patriæ.* The third and remaining branch of its jurisdiction was created and conferred upon the lord chancellor as the keeper of the great seal and of the King's conscience, by the statute of 43 Elizabeth, known as the statute of Charitable Uses, which created a new and ancillary jurisdiction by commission to be issued out of the high court of chancery, to enquire whether the funds given for charitable use had or had not been misapplied, and to see to their proper application.

2. That this prerogative power is derived directly from the king and under his sign-manual, and was not conferred by the statute of forty-third Elizabeth, known as the statute of Charitable Uses.

3. That the statute of 43 Elizabeth created no new law upon the subject of charitable uses, but simply defined what objects are included in the term charities, and only created a new and ancillary jurisdiction, a jurisdiction created by a commission to be issued out of the Court of Chancery, to enquire whether the funds given for charitable purposes had or had not been misapplied, and to see to their proper application; but the proceedings of that commission were made subject to appeal to the lord chancellor, and he might reverse or affirm what they had done, or make such order as he might think fit for reserving the controlling jurisdiction of the Court of Chancery, as it existed before the passing of that statute; that the persons selected and the machinery provided for the enforcement of the new remedy were local to the kingdom of Great Britain, and have no existence in this State, and are wholly unsuited to our laws, institutions, and modes of administering justice; that the General Assembly having failed to provide any mode or machinery for the exercise of the new jurisdiction created by the said statute, the courts of this State possess no power or means of executing or enforcing the remedy provided by such statute; and that as the said statute created no new law, nor conferred new rights, and as the remedy provided was local to the kingdom of Great Britain, and is wholly unsuited and inap-

plicable to our laws and institutions, the power and jurisdiction of our courts over charitable uses have not been increased or enlarged by the said statute.

4. That the prerogative power exercised by the court of chancery in England was conferred on such court by the king, who claimed to be the father of all his subjects, and as such had the power and right to direct and control the lord chancellor, who was the keeper of the great seal and of the king's conscience, in the protection and enforcement of the rights of such of his subjects as were unable to protect themselves.

5. That in this country the people are the true and legitimate possessors of all power; that when they created the federal government they did not confer on such government any prerogative power; that if such power exists in the people, it was retained by them in their sovereign capacity; that the people of this State retain all the power that was not delegated to the federal or state governments; that it is expressly declared in our State constitution that the judicial power of the State shall be vested in a Supreme Court, in Circuit Courts, and in such inferior courts as the General Assembly may establish, and that such courts shall have such civil and criminal jurisdiction as may be prescribed by law; that the General Assembly has only conferred upon the courts of this State judicial power and functions; that the courts of this State having no prerogative power, and being incapable of administering and enforcing the remedy provided by the statute of charitable uses, they only possess judicial power, and can only exercise, in reference to charitable uses and trusts, such power and jurisdiction as was and is possessed and exercised by the court of chancery in England acting as a court of equity.

6. That a devise or grant to a corporation capable of holding, or to a person or persons, either by name or so described that they can be readily ascertained, for a definite and specific use, is good at law; and the powers of a court of chancery are confined to the mere execution of the trust,

to secure the faithful application of the fund or property to the use and object indicated in the deed or will; in other words, to carry out the intention of the grantor or testator, as thus expressed.

7. To constitute a charitable use, there must be a donor, a trustee competent to take, a use restricted to a charitable purpose, and a definite beneficiary. In case of a grant or demise, where there is no party or parties designated who can take the property, or where they are so uncertain that the court cannot direct intelligently the execution of the trust, the property remains undisposed of, and falls to the heir or next of kin. A court of chancery, always acting for the beneficiaries, stops the instant it ascertains that there are none, or that they are so uncertain that it will have to act in the dark when it sets about the application of the trust.

8. That the jurisdiction of the court of chancery is not to create a trust. Its powers in this country are merely to direct the execution of the donor's intention, and to prevent the object from being deprived of the benefit intended. The court in all its doings represents the persons, institutions, and classes who are to be benefited. It is for the beneficiaries alone that the court interposes; and when invoked by the trustees, it is only that they require the interposition of the court to effect the purpose, and to secure to the beneficiaries the charity of which they should be the just recipients.

9. That the *cy pres* power, which constitutes the peculiar feature of the English system, and is exerted in determining gifts to charity where the donor has failed to define them, and in framing schemes of approximation near to or remote from the donor's true design, is unsuited to our institutions, and has no existence in the jurisprudence of this State on this subject.

10. That a gift to charity is maintainable in this State, if made to a competent trustee, and if so defined that it can be executed as made by the donor by a judicial decree, although the beneficiaries are not designated by name or specifically

pointed out, if the trustee is invested with full and ample discretion to select the beneficiaries of such charity from the class of persons named; but where the beneficiaries are described, as in this case, as the children, both male and female, of the African race in the United States, and where such race consists of about four millions, it will be impracticable to ascertain the beneficiaries, and distribute the proportionate share of such fund to each of such beneficiaries; and where, as in this case, the trustees have no discretionary power to select the beneficiaries from the class named, the devise and bequest are void for vagueness and uncertainty.

11. That there is no difference whether a devise or bequest be immediate to an indefinite object, or to a trustee for the use and benefit of an indefinite object. If it be immediate to an indefinite object, it is void; and if it be a trust for an indefinite object, the property that is the subject of the trust is not disposed of, and the trust results to the benefit of those to whom the law gives the property in the absence of any other disposition of it by the testator or donor.

12. If the charity does not fix itself upon any particular object, but is general and indefinite, such as the promotion of the moral and intellectual condition of a race, or the relief of the poor, and no plan or scheme is prescribed, and no discretion is lodged by the testator in certain and ascertainable individuals, it does not admit of judicial administration. In such a case in England the administration of the charity is cast upon the king, to be executed *cy pres*, while in this country the property devised lapses to the next of kin. If, however, in such a case, certain and ascertainable trustees are appointed, with full powers to select the beneficiaries and devise a scheme or plan of application of the funds appropriated to the charitable object, the court will, through the trustees, execute the charity.

13. That where trustees capable of taking the legal estate were originally appointed, so that a valid use was in the first instance raised, and the case was thus brought within the jurisdiction of the court of chancery, that court would

supply any defect which might arise in consequence of the death or disability or refusal of the trustees to act, by appointing new trustees in their place; but when no competent trustees were in the first instance appointed, so that no legal estate ever vested, of course no use was raised, and the court of chancery acquired no jurisdiction of the case.

14. That it is a well settled rule of construction, that all the parts of a will are to be construed together and in relation to each other, and so as, if possible, to form one consistent whole; and that words and limitations may be transposed, supplied, or rejected where warranted by the immediate context or the general scheme of the will, but not merely on conjectural hypothesis of the testator's intention, however reasonable, in opposition to the plain and obvious sense of the language of the instrument; and that we should place such a construction upon the will as will sustain and uphold it in all its parts, if it can be done consistent with the established rules of law and construction.

15. That over the church, as such, the legal tribunals do not have, or profess to have, any jurisdiction whatever, except to protect the civil rights of others and to preserve the public peace. All questions relating to the faith and practice of the church and its members belong to the church judicatures to which they have voluntarily subjected themselves. But the civil courts will interfere with churches and religious associations, and determine upon questions of faith and practice of a church when rights of property and civil rights are involved.

16. The general rule is, that parol evidence of the intention of the testator is inadmissible for the purpose of explaining, contradicting, or adding to the contents of a will; but that its language must be interpreted according to its proper signification, or with as near an approach thereto as the body of the instrument and the state of circumstances existing at the time of its execution will admit of. The doctrine in reference to mistakes in wills is, that courts of equity have jurisdiction to correct them when they are ap-

parent on the face of will. But the mistake must be apparent on the face of the will, and must be such as may be made by a proper construction of its terms; otherwise, there can be no relief. Parol evidence, or evidence *dehors* the will, is not admissible to vary or control the terms of the will, although it is admissible to remove a latent ambiguity.

17. In so far as the cases of *M'Cord* v. *Ochiltree*, 8 Blackf. 15; *Sweeney* v. *Sampson*, 5 Ind. 465; and *The Common Council of Richmond*, v. *The State*, 5 Ind. 334, decide that the power and jurisdiction of the courts of this State have been increased and enlarged by the statute of 43 Elizabeth, and that such statute can be executed in this State, they are in conflict with this opinion, and to such extent they are overruled.

The judgment is affirmed, with costs.

*L. B. Sims* and *D. D. Pratt*, for appellants.

*J. A. Stein, Z. Baird, R. H. Milroy*, and *J. H. Gould*, for appellees.